735 So.2d 1131 (1999)
James Michael DAWSON, Appellant,
v.
TOWNSEND & SONS, INC., Appellees.
No. 98-CA-00479-COA.
Court of Appeals of Mississippi.
June 8, 1999.
*1133 Charles T. Yoste, Starkville, Attorney for Appellant.
James D. Holland, Ridgeland, Andrew W. Eversberg, Ridgeland, Attorneys for Appellees.
BEFORE SOUTHWICK, P.J., LEE, AND THOMAS, JJ.
SOUTHWICK, P.J., for the Court:
¶ 1. The plaintiff brought suit for injuries sustained when he was purposefully stabbed by a fellow patron at the defendant's grocery store. A Lowndes County Circuit Court jury found that the other patron, who was not made a defendant, was solely responsible for the damages. On appeal the plaintiff argues that the jury should not have been instructed to allocate responsibility between the wilful acts of the other patron and the allegedly negligent acts of the store owner. We agree that this was error. However, we also find that the error did not impact the jury's determination that the store owner had no negligence at all. The evidence supports the jury's verdict and we affirm.

FACTS
¶ 2. James Dawson was shopping for a birthday card in the Sunflower Food Store on Military Road in Columbus, Mississippi, on September 14, 1993, when he was attacked by John Williams. There is no suggestion that Dawson did anything to provoke the attack. After injuring Dawson, Williams left the store in unrushed fashion and displayed what appeared to be rather odd mannerisms. He was arrested by police and at the time of the trial was in the Mississippi State Hospital.
¶ 3. Williams had been a regular customer at the store, shopping there a few times a week. Described as quiet, he displayed no violent tendencies though his mannerisms made at least one employee nervous. There was testimony that Dawson's wife had received a call from the store's assistant manager after the attack indicating the store had been concerned about Williams behavior and was "afraid something like this was going to happen." The assistant manager denied saying this, though she did admit calling Mrs. Dawson to inquire about Mr. Dawson's condition.
¶ 4. The attack left a long deep scar across the left side of Dawson's face for which several corrective surgeries were performed. He testified to losing some 200 hours of work, though not all as a result of the attack, and suffering significant emotional distress. He also suffered physical pain, not only from the attack but from several of the subsequent surgeries.
¶ 5. Dawson brought suit against the owner of the store, Townsend and Sons, Inc., for failing to protect him from the attack. John Williams was not made a party to the litigation.

DISCUSSION

I. Jury's consideration of absent intentional tortfeasor
¶ 6. The appellant Dawson alleges error in the trial court's granting instructions that required that the jury consider Williams as at least partly responsible for the plaintiff's injuries. The jury after deliberations found Williams to be totally responsible. Dawson argues that Williams could not in this suit be considered at all.
¶ 7. We divide the issues regarding the jury's consideration of the knife-wielding John Williams into two parts: 1) may a *1134 portion of responsibility be assigned to a person who is not a defendant in the case; 2) may responsibility be allocated between intentional and negligent participants in the events that caused injury? Since trial, the supreme court has answered one of those questions. The second is presented to us as the first state appellate court to consider the matter.

a. Assigning responsibility to an absent tortfeasor.
¶ 8. The center of attention here is the meaning of Mississippi's statute on contribution among joint tortfeasors, Mississippi Code section 85-5-7. The text of the statute is reproduced in appendix III to this opinion. One significant ambiguity is whether responsibility for injuries can be allocated only to the parties in the suit. If someone who contributed to the injury is not a party, as the person wielding the knife in this case is not, then the plaintiff argues that one hundred percent of the responsibility must be assigned to those who are included. The statute at times refers to "party":
(7) In actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault.
Miss.Code Ann. § 85-5-7(7) (Rev.1991). Another section refers to "persons" and "tortfeasors":
(3) Except as otherwise provided in subsections (2) and (6) of this section, in any civil action based on fault, the liability for damages caused by two (2) or more persons shall be several only, and not joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault.
Miss.Code Ann. § 85-5-7(3) (Rev.1991).
¶ 9. A rule that only parties in the suit could be allocated fault would be less onerous a concept if a defendant itself could add other defendants. There is, though, no right for a defendant to implead another unless the proposed new party has "derivative liability." M.R.C.P. 14 cmt. This means that a plaintiff could select which of several tortfeasors to sue, based on considerations other than degree of culpability, and the defendants could not bring the other tortfeasors into the litigation. If the statute did not permit missing participants in the injury to have an allocation of responsibility made to them, a fairly minor contributor factually could become the sole party at fault legally.
¶ 10. Since the date of trial the supreme court has resolved this troubling question. Estate of Hunter v. General Motors Corp., 729 So.2d 1264(¶ 32) (Miss.1999). The court concluded that participants in an event who for some reason are not joined in the litigation, so-called "phantom defendants," can nonetheless have their portion of fault assigned to them. A jury may not be instructed to consider only the parties actually sued, else the defendants who are present have been unfairly denied the benefits of our system of comparative fault. Id. For example, a claimant could settle with one defendant in order to go after a "deep pocket" defendant. Id. "There is no indication that the legislature intended to reserve for plaintiffs the sole and exclusive right to make allegations of fault before a jury and to deprive defendants of the opportunity to persuade a jury that fault for a given accident lies elsewhere." Id. at (¶ 34). We need not further restate the analysis.
¶ 11. We turn to whether the instructions here presented the issue correctly.
¶ 12. Instruction D-13 stated that the assailant, John Williams, "was a proximate cause of the Plaintiff's injury" and instructed the jury to determine whether Townsend was also a proximate cause. Instruction D-15 required the jury to hold for the defendant if it found that Williams was the sole proximate cause of Dawson's damages. Jury instruction D-19 required the jury to determine Williams and Townsend's percentages of fault.
¶ 13. Since Estate of Hunter requires that "phantom defendants" have their contribution *1135 to an injury considered, we find no error in these instructions so long as John Williams was the sort of phantom that the statute recognizes. To answer that question, we turn to Dawson's remaining issue.

b. Consideration of intentional and negligent tortfeasors' responsibility in same suit
¶ 14. The meaning of the 1989 statute that changed contribution among joint tortfeasors has been the subject of confusion and controversy since its passage. H. Wesley Williams, Comment, 1989 Tort "Reform" in Mississippi: Modification of Joint and Several Liability and the Adoption of Comparative Contribution, 13 Miss. C.L.REV. 133 (1992); Cheri D. Green & Michael K. Graves, Allocation of Fault: Joint Tortfeasors in Court and the Ones Who Should Be, 63 MISS. L.J. 647 (1994). Part of the reason for such uncertainty is that the language of the statute appears to have no definite parentage. The statute arrived on the legal scene without being derived from any document with an understood meaning, such as the Uniform Contribution Among Tortfeasors Act. 12 UNIFORM ACTS ANNOTATED 185 (1996).[1]
¶ 15. We start by looking at the purpose of the statute and only then examine precise words. More metaphorically, we could say that it is instructive to look at the forest before examining trees. Out of eight subsections, only one directly discusses allocating responsibility among tortfeasors: "the trier of fact shall determine the percentage of fault for each party alleged to be at fault." Miss.Code Ann. § 85-5-7(7). The remainder addresses other issues, principally limits on joint liability for damage awards and the right of contribution.
¶ 16. As a brief preliminary, we define the two parts of a key phrase. "Joint liability" means that two or more parties together have an obligation. BLACK'S LAW DICTIONARY 838 (6th ed.1990). "Several liability" is an independent obligation of a party that permits suit without the joinder of other obligors. Id. at 1374. Therefore "joint and several liability" is an obligation on each person, whether sued alone or with others, to pay an entire award. Id. at 837.
¶ 17. We leave the broad view of the forest in order to examine the trees. The first of two relevant sections defines "fault" to include "negligence, malpractice, strict liability, absolute liability or failure to warn. `Fault' shall not include any tort which results from an act or omission committed with a specific wrongful intent." Miss.Code Ann. § 85-5-7(1) (Rev.1991). The next important section has already been quoted, but the specific relevant language is "[e]xcept as otherwise provided in subsections (2) and (6) of this section, in any civil action based on fault, the liability for damages caused by two (2) or more persons shall be several only, and not joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault." Miss.Code Ann. § 85-5-7(3) (Rev.1991).
¶ 18. This language was interpreted by the United States Court of Appeals for the Fifth Circuit. Whitehead v. Food Max of *1136 Mississippi, Inc., 163 F.3d 265 (5th Cir. 1998). The decision was handed down on December 16, 1998. Thus the court did not have the benefit of the January 14, 1999 decision in Estate of Hunter. Though Hunter does not address the specific issue, it does articulate the public policy that the contribution at least of all negligent tortfeasors must be considered, whether parties to the suit or not. The policy was described this way:
A rule of law limiting a jury to a consideration of the fault of parties at trial would permit a plaintiff to settle with a defendant primarily responsible for a given accident, file suit against a "deeper pockets" defendant who may bear little if any responsibility for the accident, and thereupon require the jury to allocate all of the responsibility of the plaintiff's injuries between the plaintiff and the non-settling defendant.
Estate of Hunter, 729 So.2d 1264 (¶ 32.). The jury in this case certainly decided that Townsend bore "little if any responsibility" for the injury, but that was responsibility shared with someone who was not at "fault" as defined in the statute. The plaintiff argues that he is entitled to have a jury consider solely whether the owner of the grocery store had a causative relationship to his injury. If so, then one hundred percent of the damages must be paid by Townsend.
¶ 19. What Estate of Hunter answers is that the presence or absence of tortfeasors as defendants named in the suit is irrelevant. If an intentional tortfeasor's contribution to responsibility is relevant under the statute, then public policy would not allow the plaintiff's decision to omit one or more of those tortfeasors to impact the liability of those who are defendants. If the man with the knife, Williams, is not joined as a defendant, public policy requires that the allocation of responsibility be the same as in the case in which Townsend and Williams both are defendants.
¶ 20. The parties accept that John Williams, even if mentally ill, committed a wilful tort. We do address an issue that is not raised and analyze the law as if Williams had a specific wrongful intent under the statute. The only question, then, is whether the statute contemplates that a wilful contribution to an injury is allocated just as is negligence.
¶ 21. The Fifth Circuit in its analysis relied exclusively on the definition of "fault" in the statute. The court held that since allocations of responsibility under subsection (3) are "in direct proportion to his percentage of fault," a tortfeasor whose acts were not fault-based could not be part of the calculation to reach 100 percent of causation of an injury. The federal court held that "Kmart's percentage of `fault' here is 100 percent, because intentional tortfeasors Seaton and Jones have no `fault' as defined by subsection (1)." Whitehead, 163 F.3d at 281. We agree that "fault" does not include wilful contributors to an injury. But we also look at other provisions in the statute.
¶ 22. What the Fifth Circuit may not have considered relevant but which we analyze is another section of the same statute. It prevents the basic reform of the statute, which is to limit joint and several liability for fault-based actions, from applying to intentional tortfeasors. "Joint and several liability shall be imposed on all who consciously and deliberately pursue a common plan or design to commit a tortious act, or actively take part in it." Miss. Code Ann. § 85-5-7(6). The statute accepts that injury is caused not only by "fault," but also by wilful, non-fault based acts. What the statute does not discuss explicitly is what to do when "fault" and intentional acts both contribute to an injury. Does an allocation to one group of actors, such as those at "fault," total 100 percent even if there is another group who deliberately contributed to the injury? If so, does that second group's allocation also total 100 percent? Nothing in the statute explicitly answers those questions.
*1137 ¶ 23. What we know from the statute is that there is only limited joint and several liability for those at fault and complete joint and several liability for intentional actors. Quite simply our task is to sort through what is unsaid about a hybrid case, in which "fault" and wilful acts both are involved. The definition of "fault" is clear, but so is the definition of wilful acts.
¶ 24. The United States Court of Appeals' views of a Mississippi statute not interpreted by the state's supreme court are entitled to great weight but are not binding. Since we have the benefit of the later supreme court decision in Estate of Hunter, we also must decide whether the analysis of Whitehead fully considers the as-of-then unarticulated strong public policy underlying the statute. Regardless, we undertake our independent function of deciding, using all the best available material including but not limited to what a federal court held, what this statute means.
¶ 25. Traditional statutory construction rules are our tools for uncovering meaning:
The primary rule of construction is to ascertain the intent of the legislature from the statute as a whole and from the language used therein. Where the statute is plain and unambiguous there is no room for construction, but where it is ambiguous the court, in determining the legislative intent, may look not only to the language used but also to its historical background, its subject matter, and the purposes and objects to be accomplished.
Clark v. State ex rel. Mississippi State Med'l Ass'n, 381 So.2d 1046, 1048 (Miss. 1980). Among the subordinate rules is that the meaning of words must be taken from their context. Crum v. Brock, 136 Miss. 858, 867, 101 So. 704 (1924) ("single woman" in statute interpreted to include a widow).
¶ 26. We also find assistance or at least enlightenment from another precedent:
It is a delicate task when a court is called to pass upon an act of the Legislature, and deduce therefrom the intention of the lawmaking body, when words which could have been used easily and readily thereby removing obscurity and doubt, are omitted from it.
White v. Miller, 162 Miss. 296, 139 So. 611, 614 (1932). The somewhat startling observation underlying that last quoted statement is that the words chosen for statutes may not always be intended to remove confusion. To leave some issues unresolved and thereby permit a continuation of the "debate" in the courts may on occasion be part of a legislative compromise. That has been said about some congressional enactments. One well-known example is the issue of the retroactivity of the 1991 Civil Rights Act, an issue that "was deliberately left undecided; Congress left the issue to be determined by the federal courts, with different factions each hoping that their view" would prevail. Kent v. Howard, 801 F.Supp. 329, 335 (S.D.Cal. 1992). The same occasional compromise to agree to leave meaning unsettledmay not be unknown at the State level.
¶ 27. When there is confusion, one accepted means to gain perspective is "by a consideration of the old law, the mischief [that had arisen under that law,] and the remedy" that was chosen to ameliorate it. Parchman v. Mobile & Ohio R. Co., 143 Miss. 726, 109 So. 665, 667 (1926) (concurring opinion). The best available sources for the information here are the external context of the pre-existing statutes and the defects in them that were recognized as requiring a remedy, the drafting context of the language of the bill as it went through various transformations into a final enactment, and the internal context of the final statutory language itself.
¶ 28. Prior to the 1989 Act that we will discuss, there were two relevant statutes. The first is the comparative negligence statute that still exists. Miss.Code Ann. § 11-7-15 (1972). It provides that in all personal injury actions, the negligence of *1138 the injured party reduces the recovery in damages "in proportion to the amount of negligence attributable to the person injured" but does not prevent a recovery. Id. Another statute provided that when a personal injury judgment was rendered against two or more defendants, they "shall share equally the obligation imposed by the judgment...." Miss.Code Ann. § 85-5-5 (1972), repealed 1989 Miss. Laws ch. 311, § 6 (see this opinion's Appendix I). Reading the statutes together, the overall judgment against multiple defendants could be anywhere from 1% to 100% of the damages suffered by the plaintiff, with the defendants' jointly and severally liable to the plaintiff but sharing the monetary obligation pro rata among themselves.
¶ 29. The "mischief" that has been described under this approach and was the focus of the change whose meaning bedevils us today, was two-fold. First was that contribution was limited just to those whom the plaintiff chose to sue. Missing tortfeasors who were not part of a joint judgment could neither be brought into the suit by those who were defendants nor sued later for contribution. Secondly, there were those who believed that joint liability unfairly penalized defendants with the obligation to pay an entire judgment, regardless of how small their contribution to an injury might be. Thus in many instances the benefits of contribution were slight. Harry R. Allen, Joint Tortfeasors A Case for Unlimited Contribution, XLIII MISS. L.J. 50, 56-57 (1972).
¶ 30. With these background considerations, we turn to the remedy selected by the 1989 legislature. The original bill that became section 85-5-7 would have altered several statutes of limitations and also amended section 85-5-5. The proposal allocated the obligation of a judgment to defendants "in an amount equal to their percentage of fault," not pro rata; the allocation could be determined in the trial that awarded damages or in a separate action. 1989 H.B. 1171, § 7 as introduced.[2] An attempt to substitute language similar but not identical to what later became section 85-5-7 for this fairly brief, though still significant amendment, initially failed. 1989 Miss. HOUSE J. 235-237.[3] Sections 1-3, 5-6 and 8 of that substitute amendment are nearly identical to language developed by the American Tort Reform Association and promoted as a model act beginning in 1986.[4] Section 4 was taken from Mississippi Code section 85-5-5 and section 7 from the Uniform Comparative Fault Act of 1977. UNIF. COMP. FAULT ACT § 6, 12 U.L.A. 126, 147 (1996). However, what passed the House was the original bill with minor changes. 1989 H.B. 1171, § 7, as passed by the House.
¶ 31. In the Senate, what is now section 85-5-7 was adopted and later was approved by the House. 1989 MISS. SENATE J. 565-568 & 625. A useful perspective on how to interpret the final enactment is gained by examining the drafting context, i.e., the process of revision that culminated in the statute. The rejected House floor amendment that later became the source for much of the language in the statute, was one viewpoint of a comprehensive, harmonized revision. Its greatest utility is in enabling this Court to understand how certain language originally fit together and then helping us discern from that context what the changes should be interpreted to *1139 mean. By starting with the whole, then reviewing what was discarded or appended, we can better understand what the ultimate creation is supposed to beand not be. This review is especially useful in informing us what issues were even under consideration. If all proposals were silent on one point, a conclusion is fairly justified that the statute should not be interpreted as being the result of focused attention on that point.
¶ 32. The drafting process made additions and deletions to the failed House floor amendment. We first consider the one significant addition that appears in the final act but which was not in the defeated House proposal. In an approach perhaps modeled on a Louisiana statute adopted the previous year, joint and several liability would be retained to the extent necessary to compensate an injured party for fifty percent of his recoverable damages. Miss.Code Ann. § 85-5-7(2); 1988 La. Acts, No. 430, § 1, quoted at La. Civ.Code Ann. § 2324, Historical and Statutory Notes (1997). The fifty percent floor for recovery has now been repealed in Louisiana, and there is no joint liability at all. La. Civ.Code Ann. § 2324 B (1997).
¶ 33. Significant deletions are more numerous and more confusing. Some of what was removed from the failed House amendment made the bill more obscure without definitely changing its meaning. The issue of missing tortfeasors is the most obvious example. What had been structured in the original proposal with great clarity around "party," "persons" and "defendants" got lost with the omissions. The House proposal section (3) provided that "the trier of fact shall consider the fault of all persons who contributed to the personal injury ... regardless of whether that person was, or could have been, named as a party to the suit." 1989 Miss. HOUSE J. at 236 (See appendix II). The supreme court in Estate of Hunter has resolved the phantom defendant issue consistent with the original version of the bill. Though deleting the section that required fault to be allocated to phantom defendants could be considered an indication of legislative intent to prevent the allocation, when nothing with equivalent clarity replaces that language the purpose is in shadows. At best it demonstrates a majority agreed to proceed without clarity. The supreme court determined that there was fundamental unfairness in permitting a plaintiff to determine which negligent defendants to sue, with ramifications that impacted due process. Estate of Hunter, 729 So.2d 1264 at (¶ 32).
¶ 34. Since the missing tortfeasor issue was resolved in Estate of Hunter, the knotty problem that we are called on to untangle concerns intentional tortfeasors. What the plaintiff argues is that the statute as passed imposes on a negligent tort-feasor alone the responsibility for an entire damage award despite that an intentional tortfeasor played a significant role in causing injury. Much like the supreme court said in Estate of Hunter about phantom defendants, such an interpretation initially appears to challenge fundamental fairness and due process.
¶ 35. The policy argument in favor of the result that Dawson seeks is actually not as extreme as might first appear. In some situations in which intentional and negligence-based torts join to cause one injury, absolving the negligent party from any liability has a substantial policy drawback. By 1989 when these amendments were being considered, there was a strong and growing judicial focus on the liability of business premises owners for injuries caused on their property by criminals, a special class of intentional tortfeasors. E.g., Grisham v. John Q. Long V.F.W. Post, 519 So.2d 413, 416 (Miss.1988). The duty that the supreme court has required be met by a business owner is "to protect the invitee from reasonably foreseeable injury at the hands of other patrons." Lyle v. Mladinich, 584 So.2d 397, 399 (Miss. 1991). That of course is no small task.
¶ 36. Some states in examining this same issue have determined that the business *1140 owner must remain exposed to liability for all of the resulting damage, else the incentives to provide premises reasonably safe from crime would be lost. A weakening of the incentives would occur if a large part of the responsibility remained on the criminal who directly caused the harm. Turner v. Jordan, 957 S.W.2d 815, 823 (Tenn. 1997); see Veazey v. Elmwood Plantation Assoc., 650 So.2d 712, 719 (La.1994) (policies on hybrid contribution). Of course, some fault on the part of the business owner must still exist that proximately led to the injuries.
¶ 37. Whether we agree with that policy position or not, two responses arise. First, the argument does not apply to all hybrid intentional and fault injuries but only to those in which the negligent party creates the circumstance and the intentional party takes advantage of it. Under traditional tort analysis, that would be whenever the negligence is passive and the intent is the active agent of harm. Little by Little v. Bell, 719 So.2d 757, 761-62 (Miss.1998). Secondly and more importantly, we are not making policy but instead are trying to interpret what the legislature did when it passed this statute. When a statute is ambiguous and subject to multiple interpretations, courts need to understand the possible effects in order not to interpret the statute in such a way as to cause absurd results. Sheffield v. Reece, 201 Miss. 133, 143, 28 So.2d 745 (1947). This rule for construing statutes has usefully been rephrased into "courts should not convict the legislature of unaccountable capriciousness." Kellum v. Johnson, 237 Miss. 580, 585, 115 So.2d 147 (1959). By pointing out what might have been a consideration, we are suggesting that to some legislators the result of ignoring intentional tortfeasors in assigning responsibility may not have been capricious. Further, if the legislature was attempting to halt a significant and developing line of supreme court precedents, we might expect some clarity in the act of doing so. We will look for that.
¶ 38. We now focus on how the various versions of the legislation dealt with intentional tortfeasors. We first look at what was provided in the floor amendment from which the final language was taken. Then we analyze the effect of the deletions.
¶ 39. The failed House floor amendment used the exact language to define "fault" as appears in the present statute. Then something quite similar but not identical to what became the wilful tortfeasor section 85-5-7(6) appeared:
(5) Joint liability shall be imposed only on all who consciously and deliberately pursue a common plan or design to commit a tortious act. Any person held jointly liable under this section shall have a right of contribution from fellow defendants acting in concert. A defendant shall be held responsible only for the portion of fault assessed to those with whom the defendant acted in knowing concert under this subsection.

1989 MISS. HOUSE J. at 236 (italics added; see appendix II). The only significant difference is that the italicized third sentence of the proposal was removed from the statute as enacted. Despite that "fault" was defined to exclude all wilful torts, the deleted sentence stated that a wilful tortfeasor "shall be held responsible only for the portion of fault assessed to those with whom the defendant acted in knowing concert under this section." That may have meant that there would be no sharing of liability with those who were at "fault" or with other intentional tortfeasors who were not acting in concert. Using "fault" in two different waysboth including and excluding intentional tortswould have required judicial interpretation, but the context of the deleted third sentence adequately showed the meaning. "Responsibility" or something similar might have been a better word choice. The ATRA model bill, by making the definition apply "unless the context clearly requires otherwise," avoided creating the nominal ambiguity. See footnotes 1 & 4 above.
*1141 ¶ 40. We find that the only language in any proposal that possibly referred to a hybrid case in which intentional and negligent actors both played a role in causing harm, was this third sentence that was removed from what finally was adopted as section 85-5-7(6). By omitting this sentence, the legislature may have been trying to accomplish any number of things. Regardless, the effect was to delete the only useful textual argument that the joint liability of intentional tortfeasors was limited to the percentage of the damage that all such defendants caused, and the fault-based tortfeasors were liable individually for their total portion. The combined responsibility of the negligent parties as a group and the intentional tortfeasors as a group implicitly would have been 100%, not 200%.
¶ 41. We emerge from this examination with at least some guidance. The path that this Act took is evident. A simple change to permit contribution among tortfeasors based on a percentage of fault became a more elaborate endeavor. An amendment that would have made clear that the contribution of missing parties had to be considered, that intentional tortfeasors were liable jointly for their total share, that fault and wilful acts perhaps could be considered in one total allocation of responsibility, and that no negligent party could be made to pay for more that its percentage responsibility, was offered but encountered substantial disagreement. The final compromise left reference to intentional torts, put a 50 percent ceiling on joint liability as opposed to a total elimination, and otherwise removed all obligations to pay for more than one's allocated responsibility.
¶ 42. The study of the drafting process indicates that consideration was only briefly given to hybrid cases of intentional and at-fault defendants. Preliminarily, the review of the background did not indicate that problems with hybrid cases were part of the central "mischief" of the old statute for which a remedy was widely sought. During the drafting, the opaque decision was made to delete the sentence that implied that the two kinds of responsibility could be combined in the same action. Though the final statute recognizes intentional tortfeasors, there is no intimation that their conduct is to be compared in the allocation to parties who are at fault. Both negligence and wilful torts are considered in the statute, but there is no bridge between them. The statute almost seems to say, to paraphrase Kipling, "fault is fault and wilful is wilful and never the twain shall meet."
¶ 43. Our conclusion is that the legislature did one of two things, neither of which permits the contribution of an intentional tortfeasor to an injury to reduce the responsibility of other parties who were at "fault" as defined in the statute. Either the legislature never considered the issue at all and consequently can not be said to have intended to do anything in this area, or else consciously removed the sentence from paragraph (5) of the proposal first introduced in the House (appendix II to this opinion) intending to avoid having the contributions compared.
¶ 44. Since the answer to our question falls outside the areas governed by statute, the applicable principles are as they were at common law. Except where changed by statute, "[e]ach of two or more persons whose tortious conduct is a legal cause of a single and indivisible harm to the injured party is subject to liability for the entire harm." 4 RESTATEMENT (SECOND) OF TORTS § 875 (1979); Mississippi Central Railroad Co. v. Roberts, 173 Miss. 487, 505-506, 160 So. 604 (1935) (in "the absence of statute expressly so authorizing, there is no apportionment" among those who concurrently cause one injury). Relying on this section of the RESTATEMENT, the supreme court held:
One defendant may create a situation upon which the other may act later to cause the damage. One may leave combustible material, and the other set it afire; one may leave a hole in the street, *1142 and the other drive into it. Liability in such a case is not a matter of causation, but of the effect of the intervening agency upon culpability. If a defendant is liable at all, he will be liable for all the damage caused.
State ex rel. Richardson v. Edgeworth, 214 So.2d 579, 588 (Miss.1968). Had the jury found that Townsend was negligent, then it would have been "liable for all the damage caused."
¶ 45. Within the category of those at fault or of those who acted wilfully, the statute provides for allocation based on percentage of responsibility. Miss.Code Ann. § 85-5-7(3) & (6). Between categories, the statute is silent and therefore each group remains liable for all.
¶ 46. We return to our starting point. Because of Estate of Hunter, we find that a plaintiff cannot adversely impact defendants by a decision to join some but not all in the suit. Yet whether an intentional tortfeasor is joined or not, those parties to an event who are at "fault," including potentially a plaintiff, are responsible for one hundred percent of the damages. The allocation under section 85-5-7(7) should be solely to the at-fault parties.[5]
¶ 47. We do not decide how a suit should proceed if wilful and at-fault parties are both joined since that is not before us. There are possible means to structure a hybrid suit despite the silence of the statute, such as a jury's being instructed to assign a second one hundred per cent of the responsibility to wilful parties. Traditional joint and several liability rules permitted only one recovery of damages, and nothing in the statute would allow a plaintiff to receive a double recovery. See Knox Glass Bottle Co. v. Underwood, 228 Miss. 699, 764-65, 89 So.2d 799 (1956). The plaintiff would be entitled to receive all "recoverable damages" from the various parties, subject to the 50% ceiling for the joint liability of those at fault. An intentional tortfeasor who is "held jointly and severally liable under this section shall have a right of contribution from his fellow defendants acting in concert." Miss.Code Ann. § 85-5-7(6). The interrelation of these provisions must wait for another case.
¶ 48. Moreover, the at-fault parties may be entitled, if their contribution to the injury is passive while the intentional tortfeasor was the active party, to receive indemnity from the intentional actor. Olger C. Twyner, III, A Survey and Analysis of Comparative Fault in Mississippi, 52 MISS. L.J. 563, 581-82 (1982). That may well be an empty right, but absent language in the statute mandating a different rule, the burden of the intentional tortfeasor's possible insolvence has traditionally been on other defendants and is not shifted to the plaintiff by the 1989 amendment.
¶ 49. This interpretation is not without its difficulties. The surest perspective from which to see a possible inconsistency is that the statute that is abolishing joint and several liability for those at fault (with the 50% limit) is nonetheless in the hybrid situation of intentional and negligent acts that operate together, leaving negligent parties jointly and severally liable for all the damages caused by others who commit a wilful tort. Yet we think that the better reading. The legislature changed some but not all rules in this area. What it did not explicitly attempt was to blend the contribution of intentional and negligent actors into one damage allocation. That has never been the law in Mississippi and we find that the statute, by its silence, did not make it so.

II. Evidence sufficient to make a jury question
¶ 50. We have held that Dawson is correct regarding the error in the instructions. *1143 However, the store owner Townsend argues that this error did not affect the outcome. The jury was to "determine the percentage of fault" for both Townsend and John Williams. The jurors did not complete the verdict form that would show an allocation but returned a hand-written verdict simply stating that they found for the defendant. Another instruction provided that if the plaintiff failed to prove any of the elements of the claim of negligence, "then your verdict shall be for the defendants." We are urged to hold that this is a case of the jury's finding that no negligence was ever proved.
¶ 51. In effect Townsend argues that the instructions' error regarding allocating fault to Williams was harmless. To the contrary, Dawson alleges that erroneously telling the jury that it had to allocate some fault to John Williams permeated and skewed the deliberations on negligence. That argument would be more convincing if the jury had assigned some fault to the store owner. Even without the error of the instructions, two critical matters would have been presented to the jury in the same way: the same facts of John Williams's actions and the same alleged negligent acts or omissions by the store owner Townsend. When both parties' contributions to the injuries were to be allocated, the jury did not find the store owner responsible for even a tiny portion of the damages. It is implausible that on the same facts and under the same instructions as to what constituted negligence by the store owner, the jury would make the store responsible for all the damages. To be more certain regarding the harmlessness of error, we examine the evidence in some detail in order to understand the factual basis for Townsend's alleged negligence.
¶ 52. The substance of the case was presented on jury instructions regarding negligence. One instruction was that "negligence is the failure of reasonable care." The next instruction was that an "element, or test, of proximate cause is that an ordinarily prudent man should reasonably have foreseen that some injury might probably occur as a result of his negligence." Finally, the most comprehensive instruction on the grocery store owner's duty was this:
Townsend and Sons, Inc., had a duty to exercise reasonable care to protect Michael Dawson from reasonabl[y] foreseeable injury from other patrons....
The requisite cause to anticipate an assault by a patron may arise from either actual, or constructive, knowledge of the patron's violent nature.
If you find from a preponderance of the evidence in this case that Townsend and Son's, Inc., including any of its employees,... had cause to anticipate, by either actual or constructive knowledge, that an assault might occur by the assailant John Williams and that Townsend and Son's, Inc., negligently failed to exercise reasonable care that an ordinarily prudent person would have under the circumstances, then your verdict shall be for the plaintiff.
. . .
The conclusion of the instruction required a verdict for the store owner if the plaintiff failed to prove any element of the cause of action. Other instructions elaborated on specific parts of this comprehensive statement of the duty.
¶ 53. These instructions regarding duty were chosen because the trial court found that Townsend was not on notice of a general danger from crime at this location. Instead, the court held that the only possible reason that Townsend should have anticipated the injury was the knowledge acquired by store employees from seeing the attacker, John Williams, on several previous occasions at the store. Since neither party challenges the instructions stating the duty owed by a store owner in these circumstances, we are not called upon to determine whether the instructions are correct. "Violent nature" appears *1144 in such cases as Crain v. Cleveland Lodge, 641 So.2d 1186, 1189 (Miss.1994).
¶ 54. The alleged negligence upon which Dawson's suit is based is the store owner's failure to protect Dawson from a reasonably anticipated threat from this one person. Most of the evidence indicated that though Williams exhibited unusual behavior that made employees uncomfortable, each employee stated that Williams had not previously revealed violent tendencies. We will examine all the evidence to determine if a jury could have decided otherwise.
¶ 55. The first witness was a former employee at Townsend's store. She testified that Williams came to the store three or four times a week, wearing a coat and hat except sometimes in summer, and always with sunglasses, a "wrapped up bag and some clothes or something with him." She called him a "scary person" and he did "act like he was right." This employee told the assistant manager of her observations. This employee testified that she was not surprised about Williams's assault because she knew that eventually "something was going to happen cause you could just feel that man wasn't right." No guidance was given her by management on what to do when a frightening customer was present. On cross-examination the employee stated that she had never previously seen Williams do anything violent. She revealed no previous incidents of any actions towards other customers and stated that she had never seen him "bother" any other customer until the day of the attack. Other employees had not mentioned concerns to her about Williams, nor had she stated hers to anyone except for the assistant manager.
¶ 56. The next witness was the plaintiff, Michael Dawson. He testified that he had never previously seen Williams, either on an earlier day or on the day of the attack prior to being stabbed. His testimony focused on the attack itself, what occurred thereafter, and the extensiveness of his injuries. He did state that he saw no security guards at the store on the day of the attack but had never considered the store to be a dangerous place.
¶ 57. Testimony was then given by the assistant manager to whom the first witness-employee had reported her nervousness about John Williams. She had been an assistant manager at that location for sixteen years. She stated that no security procedures were in place to address frightening customers. She had seen Williams before and only thought that he was odd because he would never respond to conversation that she sought with him at the check-out stand or elsewhere. This witness denied that anyone had ever reported concerns about Williams to her. She acknowledged calling Mr. Dawson's home after the incident to inquire about his condition. She talked to Mr. Dawson's wife but did not say that prior to this attack that store employees were scared of Williams.
¶ 58. Mrs. Dawson testified that after the attack, this assistant manager called her to say that "they had been afraid something like this was going to happen. He comes into the store often and never says a word to anyone. He acts like he's crazy or drugged. We all just hold our breath" whenever John Williams was at the store. Mrs. Dawson had never previously noticed the attacker Williams.
¶ 59. Williams was never called as a witness. There were statements made in the record that charges for the assault were dropped. Instead, he was committed to Whitfield State Hospital.
¶ 60. The trial court refused to grant a directed verdict on the question of negligence. The judge first said that it "is a very close question" as to whether a directed verdict should be granted. However, relying solely on Mrs. Dawson's testimony that the assistant manager had admitted that employees were worried something like this would happen, the court held that a fact issue existed of whether the store owner was on notice that Williams was a threat. A directed verdict "should be granted only where the *1145 facts and inferences so considered point so overwhelmingly in favor of the moving party that reasonable men and women could not have arrived at a verdict for the non-movant." Garner v. Hickman, 733 So.2d 191, 195 (Miss.1999).
¶ 61. Was there evidence upon which a jury might have found "cause to anticipate an assault by a patron," arising "from either actual, or constructive, knowledge of the patron's violent nature" as stated in the instructions? We cannot conclude that the presence of customers with mental or emotional disabilities, who act "strange" or otherwise differently than most customers, creates reason to anticipate that they are violent. It may be unavoidable for many people to be nervous around those with mental illness. The mentally ill enter grocery stores and many other establishments, as they have a right to do. Under various laws, including the Americans with Disabilities Act, there are considerable restrictions on the legal right of a business to treat a mentally ill person any differently than it does other customers. See 42 U.S.C. § 12182; 28 C.F.R. §§ 36.101-36.104.
¶ 62. Because of the unchallenged jury instructions, we must decide what creates a jury question that such a person has demonstrated a "violent nature" that requires the store owner to anticipate an assault. "Anticipate" is used here in its precise form, which is both that a person is aware and as a result takes steps in advance to prepare. The evidence indicates that nothing was done to prepare, such as to assign an employee to watch or follow Williams, or to keep him from entering if that even legally could be done. Part of the proof, though, must create a jury question that a store owner could have done something effective to reduce the harm to one patron once on notice of another patron's violent nature. In other words, the breach of the duty must have proximately caused the injury.
¶ 63. Two witnesses stated something relevant to this point. The testimony of the first store employee was that Williams made her nervous, that he appeared to be mentally or emotionally disturbed, that he never interfered or interacted with other customers, that his presence scared her, and that she thought that something like this attack might happen. In addition, Mrs. Dawson testified that the assistant manager had told her something similar over the telephone, but the assistant manager herself denied the statements.
¶ 64. There is a significant legal question of whether what Mrs. Dawson said can be used as substantive evidence or is admissible solely as impeachment of the assistant manager's denial of having said that. As impeachment, the statement only undermines the believability of the assistant manager's testimony but does not itself become substantive evidence. See M.R.E. 613(b). However, there is a hearsay exception for the evidence if it is an admission by the opposing party's "agent or servant concerning a matter within the scope of his agency or employment...." M.R.E. 801(d)(2). It appears likely that the assistant manager's agency covered ascertaining whether certain patrons were dangerous and whether something should be done about them, even though several witnesses stated that there was no policy regarding such people. The former employee who was the first witness called at trial testified to about the same thing anyway, and there is no need to determine whether Mrs. Dawson's statements were substantive evidence of concerns about Williams.
¶ 65. Even if we accept the testimony both of Mrs. Dawson and of the first store employee as being fully usable on this point, still neither stated that she observed any violent nature in Williams. He was "scary" and made people "nervous." People who are mentally ill quite often for that reason alone cause nervousness in others. We do not find that to be enough to allow a jury to conclude that he had a violent nature as the unchallenged jury instruction required.
¶ 66. The sole remaining usable evidence is that at least one person who worked at *1146 the store was concerned that "something like this would happen." That concern is conclusory. It is necessary that the basis of that concern be evidence of violent tendencies. To review this point, we first hold that the store cannot insulate itself from liability by failing to have reasonable procedures to permit management to get such information. Thus even if the assistant manager did not know, it may be enough to go to the jury that another employee knew that a customer was violent. However, not even the plaintiff's witness who formerly worked at the store had evidence of violent proclivities. That an employee was nervous around a mentally ill customer whom the store was obligated to serve as it did other customers unless something more than "strangeness" of behavior was exhibited, and that the employee believed that "something like this would happen," are ultimately inadequate evidence. There is not even an inference from evidence that Williams had ever done anything but keep to himself, dress unusually, carry possessions in a bag, and not talk. That understandably made people uncomfortable and even nervous, but it is not evidence of a violent nature.
¶ 67. We need not decide what had to be shown. We are only holding that if the parties agree that the foundation of liability is whether a customer exhibited violent tendencies, the fears engendered by nonviolent mentally ill customers are not enough to require the store to assign regular workers or hire security guards to follow such customers or even bar their admittance. Mental illness does not equate to exhibiting violent tendencies.
¶ 68. Prior to the assault, this quiet, mentally ill customer kept to himself and would not talk to anyone. Though many of us at times may amateurishly speculate that it is the quiet person who is the incipient knife-slasher, this case did not go to the jury on psychological evidence regarding the characteristics of mentally ill people and whether a store should have become expert on recognizing the dangerous characteristics. The jury was simply asked to decide whether Williams had previously exhibited violent tendencies for which Townsend had knowledge. If so, the jury was then to decide whether that knowledge gave reason to anticipate an assault, that reasonable steps were not taken, and as a result harm occurred. Fault would then have to be assigned to Townsend. In other words, based on proper instructions on determining if the store owner had fault, the jury was required to assign to the store at least some responsibility if in the jury's view the evidence supported doing so. Jurors are presumed to follow their instructions.
¶ 69. Considering this evidence, we find that the jury's deliberations on whether Townsend had any fault were not impacted by the erroneous instruction that Williams had some. The error was harmless.
¶ 70. THE JUDGMENT OF THE CIRCUIT COURT OF LOWNDES COUNTY IS AFFIRMED. COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., COLEMAN, DIAZ, LEE, PAYNE, & THOMAS, JJ., CONCUR.
IRVING, J., CONCURS IN RESULT ONLY.
BRIDGES, J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY KING, P.J.

APPENDIX I

1989 House Bill 1171 as introduced.

[Deletions to the previous statute are marked with a strikeout; additions are underlined.]
The first 6 sections of H.B. 1171 are not relevant to this case.
SECTION 7. Section 85-5-5, Mississippi Code of 1972, is amended as follows:
Section 85-5-5. In any action for damages where judgment is rendered against two (2) or more defendants, jointly and severally, as joint tort-feasors, the defendants *1147 against whom such a judgment is rendered shall share equally the obligation imposed by such judgment in an amount equal to their percentage of fault, and if one (1) of such defendants pays an amount greater than the total sum of the judgment divided by the number of defendants against whom the judgment was rendered amount equal to his percentage of fault, then the other defendants shall be jointly and severally liable to him for the amount so paid in excess of his proportionate part percentage of fault; provided that no defendant shall be liable to any other defendant for more than his proportionate share of the original judgment percentage of fault. A joint tort-feasor shall have the right to have the percentage of fault allocated among all joint tort-feasors by the trier of fact in the trial in which the damage are awarded or in a separate action.
Provided further, that in determining, for the purpose of the above contribution, the number of defendants against whom the judgment has been rendered, an employer and his employee, or a principal and his agent, shall be considered as one (1) defendant when the liability of such employer or principal has been caused by the wrongful or negligent act or commission of his employee or agent.
Provided further, that the liability of such defendants against whom such a judgment has been rendered shall be joint and several as to the plaintiff in whose favor such judgment has been rendered.

APPENDIX II

Floor amendment to House Bill 1171. 1989 MISS. HOUSE J. 235-237.

[The sections that are included in the present statute are bracketed; the parentheticals indicate the subsection of Mississippi Code section 85-5-7 where each appears.]
SECTION 7. (1) For the purpose of [this section the term "fault" means an act or omission of a person which is a proximate cause of injury or death to another person or persons, damages to property, tangible or intangible, or economic injury, including but not limited to negligence, malpractice, strict liability, absolute liability or failure to warn. "Fault" shall not include any tort which results from an act or omission committed with a specific wrongful intent. (Subsection (1)) ]
(2) [Except as may be otherwise provided in subsection (5) of this section, in any action based on fault, the liability of each defendant for damages shall be several only and shall not be joint; each defendant shall be liable only for the amount of damages allocated to that defendant in direct proportion to that defendant's percentage of fault (Subsection (3)) ], and a separate judgment shall be rendered against the defendant for that amount. To determine the amount of judgment to be entered against each defendant, the trier of fact shall determine the total damages and shall also determine the percentage of fault of each party alleged to be at fault. The court, with regard to each defendant, shall multiply the total amount of damages by the percentage of each defendant's fault, and that amount shall be the maximum recoverable against that defendant.
(3) [This was omitted] In assessing percentages of fault, the trier of fact shall consider the fault of all persons who contributed to the personal injury or death or damage to property, or economic injury, regardless of whether that person was, or could have been, named as a party to the suit. Fault of a nonparty shall be considered if the plaintiff entered into a settlement agreement with the nonparty. Fault of a nonparty shall also be considered if the defending party gives notice in its answer, as filed or as amended pursuant to court rule, that a nonparty was wholly or partially at fault. The notice shall designate the nonparty and set forth the nonparty's *1148 name and last known address, or the best identification of the nonparty which is possible under the circumstances.
(4) [In assessing percentages of fault, an employer and the employer's employee, or a principal and the principal's agent, shall be considered as one (1) defendant when the liability of such employer or principal has been caused by the wrongful or negligent act or omission of the employee or agent. (Subsection (3))]
(5) [Joint liability shall be imposed only on all who consciously and deliberately pursue a common plan or design to commit a tortious act. Any person held jointly liable under this section shall have a right of contribution from fellow defendants acting in concert. (Subsection (6))] A defendant shall be held responsible only for the portion of fault assessed to those with whom the defendant acted in knowing concert under this subsection.
(6) [Omitted] The burden of alleging and proving fault shall be upon the person who seeks to establish such fault.
(7) [Omitted] A release, covenant not to sue or similar agreement entered into by a plaintiff and a person alleged to be liable discharges that person from all liability for contribution, but it does not discharge any other persons liable upon the same claim unless it so provides. However, the claim of the releasing person against other persons is reduced by the amount of the released person's proportional share of the obligation, determined in accordance with the provisions of this section, or the amount actually paid, whichever is greater.
(8) [Nothing in this section shall eliminate or diminish any defenses or immunities which currently exist, except as expressly stated in this section. (Subsection (5)) ] Assessments of percentages of fault for nonparties are used only as a vehicle for accurately determining the fault of named parties. Where fault is assessed against nonparties, findings of such fault shall not subject any nonparty to liability in this or any other action, or be introduced in any subsequent action as evidence of liability.
SECTION 8. [This was adopted. 1989 Miss. Laws ch. 311, § 6] [Section 85-5-5, Mississippi Code of 1972, which provides that joint tort-feasors share equally in any judgment rendered against them and provides for contribution between joint tortfeasors, is hereby repealed.]

APPENDIX III

House Bill 1171 as adopted and signed by the governor

Mississippi Code Section 85-5-7
SECTION 1. (1) As used in this section "fault" means an act or omission of a person which is a proximate cause of injury or death to another person or persons, damages to property, tangible or intangible, or economic injury, including but not limited to negligence, malpractice, strict liability, absolute liability or failure to warn. "Fault" shall not include any tort which results from an act or omission committed with a specific wrongful intent.
(2) Except as may be otherwise provided in subsection (6) of this section, in any civil action based on fault, the liability for damages caused by two (2) or more persons shall be joint and several only to the extent necessary for the person suffering injury, death or loss to recover fifty percent (50%) of his recoverable damages.
(3) Except as otherwise provided in subsections (2) and (6) of this section, in any civil action based on fault, the liability for damages caused by two (2) or more persons shall be several only, and not joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault. In assessing percentages of fault an employer and the employer's employee or a principal and the principal's agent shall be considered as one (1) defendant when the liability of such employer or principal has been caused by the *1149 wrongful or negligent act or omission of the employee or agent.
(4) Any defendant held jointly liable under this section shall have a right of contribution against fellow joint tort-feasors. A defendant shall be held responsible for contribution to other joint tort-feasors only for the percentage of fault assessed to such defendant.
(5) Nothing in this section shall eliminate or diminish any defenses or immunities which currently exist, except as expressly noted herein.
(6) Joint and several liability shall be imposed on all who consciously and deliberately pursue a common plan or design to commit a tortious act, or actively take part in it. Any person held jointly and severally liable under this section shall have a right of contribution from his fellow defendants acting in concert.
(7) In actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault.
(8) Nothing in this section shall be construed to create a cause of action. Nothing in this section shall be construed, in any way, to alter the immunity of any person.
[The remaining sections of House Bill 1171 are not relevant here, except that Section 6 is what repealed Mississippi Code § 85-5-5.]

BRIDGES, J., DISSENTING:
¶ 71. I respectfully dissent from the majority's conclusion in this opinion. In Mississippi, the law regarding improper jury instructions is clear. The Mississippi Supreme Court has held that jury instructions are to be read as a whole, and an error in a specific instruction may not require reversal when all the instructions read together state the applicable rules of law. Shields v. Easterling, 676 So.2d 293, 295 (Miss.1996). However, the supreme court also held that, "if those instructions do not fairly or adequately instruct the jury, this court can and will reverse." Id. The majority opinion agrees that the jury was improperly instructed "to allocate responsibility between the wilful acts of the other patron and the allegedly negligent acts of the owner," yet the majority also found that this was harmless error that "did not impact the jury's determination that the store owner had no negligence at all." However, I believe that this constitutes reversible error rather than harmless error.
¶ 72. As stated in the majority opinion, the Mississippi Supreme Court has held that parties not joined in the litigation can be assigned their portion of fault. Estate of Hunter v. General Motors Corp., 729 So.2d 1264 (¶ 32) (Miss.1999). However, as the dissenting justices in Estate of Hunter point out, the very term "party" which was used in § 85-5-7, by definition "refers to those by or against whom a legal suit is brought .... the party plaintiff or defendant." Id. The dissent further reasoned that "[T]he trier of fact only determines fault percentages for parties alleged to be at fault. One may be alleged to be at fault only if one is named in the lawsuit." Id. The dissenting justices conclude that the statute is "problematic" when a court must "instruct a jury to bring in all of the players involved with the elements of absolute strict liability, strict liability, negligence, failure to warn, and breach of contract." Id. Although Estate of Hunter held that parties not joined can be assigned their percentage of fault, the dissent strongly argues that there is no way to correctly instruct a jury to apportion percentages when the suit involves two different categories of tortfeasors. Id.
While I understand that a dissenting opinion has no authority, I am citing to the dissent in Estate of Hunter because it supports my views in regard to the statute at issue in the case sub judice.
¶ 73. In the present case, the jury was instructed to determine the percentages of fault between two categories, intentional *1150 tortfeasor and negligent tortfeasor. The majority opinion analyzed the responsibility of intentional and negligent tortfeasors involved in the same suit. The majority found that within each category, § 85-5-7 provided for allocation based on percentages of responsibility, but "between categories the statute is silent, and therefore, each group remains liable for all." Notwithstanding this conclusion, the majority determined that instructing the jury to apportion percentages of fault amounted only to harmless error. I disagree with this conclusion. Williams was not a party to the case, and although "phantom defendants" can be apportioned fault, the statute is silent in regard to intentional and negligent tortfeasors in the same suit. Accordingly, the improper jury instruction constituted reversible error. Therefore, I respectfully dissent.
KING, P.J., JOINS THIS SEPARATE WRITTEN OPINION.
NOTES
[1] Seeking the statutory language's origin, a wellspring that remained concealed after this opinion author's search, contacts were made with Phillip McIntosh, torts professor at Mississippi College School of Law; Cheri Green, a Jackson attorney and co-author of a law journal article cited in the text; and Jackson attorney Luther Munford, a participant in a 1995 Charles Clark American Inns of Court presentation on the statute. They believed that joint liability for 50% of damages was modeled on a Louisiana statute as discussed below; no one was aware of a source for other language. One person stated that the American Tort Reform Association may have prepared a model bill. An electronic mail contact with ATRA seeking a pre-1989 model act was answered with a regular mail copy of just such a document; that also is discussed below. No one was asked for nor did anyone offer an opinion regarding the meaning of any part of the statute. Cf. Samuels v. Mladineo, 608 So.2d 1170, 1184-86 (Miss.1992) (opinion on rehearing).
[2] The Mississippi Legislative Reference Bureau helpfully provided copies of each version of the 1989 bill; the original bill is reproduced in Appendix I.
[3] Because of its importance as the source of much of the language ultimately adopted, we include this floor amendment as Appendix II. Section 85-5-7 as adopted is Appendix III.
[4] See footnote 1 above. We note this advocacy group's proposal only in order to appreciate that the House amendment drew on a comprehensive model revision. ATRA's proposal does not have the status of a model act with commentary prepared by a group such as the American Law Institute, though even such "impartial" groups can be affected by a dominant philosophical or interest viewpoint. Robert E. Scott, The Politics of Article 9, 80 U. VA. L.REV. 1783, 1850 (1994).
[5] This analysis invalidates the opposite conclusion on comparing fault and wilful torts stated in a concurring opinion in Dodson v. General Motors Corp., 96-CA-00051-COA, 700 So.2d 335, 1997 Miss.App. LEXIS 969, at *58-59 (Miss.App. Sept. 29, 1998) (Southwick, J. concurring).