# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2002-CA-00669-SCT

*WALTER W. ECKMAN, M.D. AND AURORA SPINE*
*CENTERS-MISSISSIPPI, INC.*

*v.*

*LINDA MICHELLE MOORE, INDIVIDUALLY, AND*
*FOR AND ON BEHALF OF THE WRONGFUL*
*DEATH BENEFICIARIES OF JASON TAYLOR*
*MOORE, DECEASED*

DATE OF JUDGMENT:              3/4/2002
TRIAL JUDGE:                   HON. RICHARD D. BOWEN
COURT FROM WHICH APPEALED:     LEE COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANTS:      ROBERT K. UPCHURCH
                               DAVID W. UPCHURCH
                               JOSIAH DENNIS COLEMAN
ATTORNEYS FOR APPELLEE:        BOBBY L. DALLAS
                               BRAD SESSUMS
                               WALTER C. MORRISON, IV
NATURE OF THE CASE:            CIVIL - WRONGFUL DEATH
DISPOSITION:                   AFFIRMED - 10/23/2003
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE McRAE, P.J., EASLEY AND GRAVES, JJ.

### EASLEY, JUSTICE, FOR THE COURT:

### STATEMENT OF THE CASE

¶1.     This is a wrongful death case involving the medical treatment provided to Jason Taylor Moore

(Taylor) by Dr. Walter W. Eckman (Dr. Eckman), the Aurora Spine Centers-Mississippi, Inc. (Aurora),

and North Mississippi Medical Center (NMMC).[1]   On the evening of  February 20, 1999, Taylor

---

[1] NMMC  settled its portion of the judgment (40% liable) with Michelle after trial and is not party
to this appeal.

sustained a head injury by falling in a movie theater and went to NMMC for treatment by the on-call physician, Dr. Eckman. On March 20, 2000, Linda Michelle Moore (Michelle), Taylor's wife, filed suit against Dr. Eckman, Aurora and NMMC both individually and as the conservator of the estate of Taylor in the Circuit Court of Lee County. The complaint alleged personal injury to Taylor and Michelle in connection to the treatment provided to Taylor. On May 19, 2000, Taylor died, and on August 24, 2000, an amended complaint was filed on behalf of Michelle and the wrongful death beneficiaries of Taylor for alleged negligence resulting in the death of Taylor. On February 12-26, 2002, a trial was conducted, and the jury returned a verdict in favor of Michelle and the wrongful death beneficiaries for $5 million. The jury determined that Dr. Eckman and Aurora were 60% liable and NMMC was 40% liable. On March 4, 2002, a final judgment was entered by the trial court. Dr. Eckman and Aurora filed a motion for judgment notwithstanding the verdict, or, in the alternative, a motion for new trial.[2] The trial court denied the motion without a hearing. Dr. Eckman and Aurora timely filed their appeal to this Court. This Court affirms the judgment, the jury verdict, and the assessed liability of 60% of Dr. Eckman and Aurora.

## FACTS

¶2.    While at the movies, Taylor went to the bathroom and apparently slipped or fell and struck his head. He wandered out of the theater and drove away in his car. Michelle, Taylor's wife, could not find him and called him on his cellphone. Taylor seemed confused, but she eventually had Taylor go to the emergency room. Dr. Peters in the emergency room ordered a computer tomography, a.k.a. CT or cat scan, to be performed on Taylor on February 20. The CT scan showed some bleeding in the frontal lobe. Neurological checks and vital signs were ordered every two hours.

---

[2] Dr. Eckman and Aurora will be collectively referred to as "Dr. Eckman."

2

¶3.     According to the testimony of Dr. Hauser, expert witness for Michelle, during the course of the day a number of significant changes occurred to Taylor, such as nausea, increasing headaches, and later increased blood pressure. Around 1:50 p.m. the medical records indicated that Dr. Eckman ordered Talwin, a potent narcotic for pain relief, and increased the Codeine dosage from 30 milligrams up to 60 milligrams and up to 90 milligrams. According to Dr. Hauser, Talwin is more sedating than Codeine and typically avoided in head injury cases. Codeine, on the other hand, is less sedating and used to follow a patient's mental status. Even though Codeine is less sedating, Dr. Hauser testified that it should be avoided if possible. In addition, Dr. Hauser testified that Talwin has the potential for suppression of mental status in head injury patients, obscuring the clinical course for head injuries. Further, Talwin may suppress a patient's respiration which may directly increase intracranial pressure. Dr. Hauser testified that at this time, approximately 2:00 p.m., that Dr. Eckman should have gone to see Taylor, performed a detailed neurological examination and performed another CT scan. Dr. Hauser testified that in his opinion, Dr. Eckman fell below the standard of care by failing to perform these tasks.

¶4.     About 2:00 p.m. Taylor began to complain of nausea and headaches even though he had increased pain medication. Dr. Hauser testified that both these complaints along with increased blood pressure were significant. Taylor had been diagnosed with hypertension a few years before and took medication for the condition. At 6:00 p.m. his blood pressure was 150/98, which Dr. Hauser considered "worrisome" and at 170/110 two hours later. The increased blood pressure in a patient with a known head injury is "suspicious" and may indicate a progression of intracranial hypertension. The nurses informed Dr. Eckman about the increased blood pressure and he told the nurses to give Taylor his blood pressure medicine. At this point, approximately 6:00 p.m., and in light of Taylor's increased blood pressure, having a known head injury with intracranial bleeding and increased headaches and needing increased pain medication, Dr.

3

Hauser testified that Dr. Eckman fell below the standard of care. Dr. Hauser stated that Dr. Eckman should have examined Taylor and ordered another CT scan, which would have shown a subdural hematoma.

¶5. Taylor was given Monopril, his usual blood pressure medicine, just before 7:00 p.m. Instead of lowering his blood pressure, the medical records indicated that his blood pressure increased. By 8 p.m. Taylor's blood pressure was 170/110, and two hours later it was 172/124. Dr. Hauser believed that the increase in blood pressure was an indication of increased pressure in Taylor's head. The records indicated that around 10:30 p.m. the nurses notified Dr. Eckman that Taylor had what he described as the worst headache that he's ever had and of Taylor's increased blood pressure. Dr. Hauser testified that a patient complaining of the worst headache that he ever had; needing increased pain medication; and increasing hypertension, despite taking blood pressure medication, is an indication of increased pressure in the head. Dr. Eckman ordered that the Talwin and Codeine be given alternately and the check of vital signs should be decreased from every two hours to every four hours. Again, Dr. Hauser testified that Dr. Eckman fell below the standard of care and should have examined Taylor, ordered a CT scan and presumably seen the subdural hematoma, and surgically drained the area. In addition, Dr. Hauser testified that had the CT scan and surgery been performed then Taylor would not have suffered from a brain herniation, there would have been little or no further damage from the pressure in his head and he would have survived and been normal.

¶6. On cross-examination Dr. Hauser stated that from Taylor's initial admission at 11:00 p.m. Saturday night to 10:00 p.m. Sunday, there was no decline in his Glasgow Coma Score or his neurological status. A normal neurological check includes waking a patient from sleep and checking their level of consciousness, pupils, speech, orientation to person, place and time, and strength. Dr. Hauser opined that

4

the nursing staff performed appropriate neurological assessments from Taylor's presentation to the emergency room at 10:30 p.m. on February 20 through approximately 10:30 p.m. on February 21. Dr. Hauser stated that there were no documented neurological checks performed by the nursing staff between 10:00 p.m. and 6:00 a.m. (February 21-22) that sufficiently complied with the standard of care for nurses. Dr. Hauser stated that had the neurological checks been adequately performed by the nursing staff then Taylor's changes would have been discovered, the doctor could have been called and provided surgical care, the arrest and brain damage would have been avoided, and his death would have been prevented as well. The hematoma accumulated over a 30-hour period.

¶7. When Dr. Eckman was contacted by the staff, he gave no orders for surgery but, ordered a CT scan. Around noon, an angiogram was ordered, and it indicated that the blood supply to the brain was intact. Dr. Hauser testified that in his opinion Dr. Eckman failed to comply with the standard of care on February 22 by failing to operate on the hematoma. There was some apparent controversy between Dr. Eckman, claiming that he recommended surgery, and Taylor's family concerning the decision not to operate on Taylor at that time. Despite this controversy, Dr. Hauser testified that he disagreed with the information provided by Dr. Eckman to Taylor's family. Dr. Eckman allegedly stated that Taylor was essentially brain dead and that an operation would not help the situation. Dr. Hauser considered the presentation of the information to be a deviation of standard of care. Instead, Dr. Hauser testified that he would have performed the surgery on Taylor. According to Dr. Hauser, had an operation been performed shortly after taking the CT scan on February 22 and removed the clot, then Taylor likely would not have suffered massive brain damage and his later death. An operation was performed on February 23.

¶8. Dr. Eckman stated that he requested that the emergency room physician admit Taylor to the hospital about 2:00 a.m. and to make a written request for the neurological checks on him. Dr. Eckman

5

then saw Taylor about 7:00 or 8:00 a.m that same morning. During the visit Dr. Eckman collected Taylor's medical history, performed a general physical exam, and a detailed neurological exam. Other than suffering from a headache, Taylor appeared to be in normal condition. The next time that Dr. Eckman saw Taylor was after his arrest. Prior to the arrest, Dr. Eckman had a few telephone conversations with the hospital staff about Taylor's condition. Dr. Eckman stated that prior to the arrest, he had not heard from the nursing staff since about 10:00 to 10:30 p.m. the previous night.

## DISCUSSION

### I.      Whether the trial court erred by denying the superceding cause jury instruction (D1-12) requested by Dr. Eckman.

¶9.      Dr. Eckman argues that the trial court erred by refusing a superceding cause jury instruction. He maintains that the negligence of the hospital nursing staff, i.e., failing to perform neurological checks every two hours as ordered by Dr. Eckman, superceded any negligence on his part. On the other hand, Michelle argues that the jury instruction (1) incorrectly stated the law, and (2) the evidence showed that Dr. Eckman's negligence occurred before, during and after any negligence attributed to the nursing staff. The trial court heard arguments from counsel but denied the instruction without any substantive comment.

¶10.      "When reviewing jury instructions we will review all of the instructions together, rather than each isolated instruction." *Jackson v. Daley*, 739 So.2d 1031, 1037 (Miss. 1999) (citing *Hull v. State*, 687 So.2d 708, 722 (Miss. 1996)). In *Coho Resources, Inc. v. McCarthy*, 829 So.2d 1, 22 (Miss. 2002), this Court stated:

> As we have said, "on appellate review, we do not isolate the individual instruction attacked, but rather we read all of the instructions as a whole." *Payne v. Rain Forest Nurseries, Inc.*, 540 So.2d 35, 40-41 (1989). "Defects in specific instructions do not require reversal where all instructions taken as a whole fairly--although not perfectly--announce the applicable primary rules of law." *Id*. at 40-41. Further, "[t]he trial court enjoys considerable discretion regarding the form and substance of jury instructions."

6

*Higgins v. State*, 725 So.2d 220, 223 (Miss.1998). Mississippi's law on jury instructions has been summarized as follows:

> Jury instructions are to be read together and taken as a whole with no one instruction taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is fairly covered elsewhere in the instructions, or is without foundation in the evidence. We have also held a court's jury instructions will not warrant reversal if the jury was fully and fairly instructed by other instructions.

*Id.* at 223.

*Coho*, 829 So.2d at 22.

¶11.    Proposed jury instruction D1-12 stated:

> A superceding cause is an independent and unforseen act by a third person which follows the Defendant's negligence, if any you should find, and which is the substantial factor in causing the injuries alleged by the Plaintiff. A superseding cause becomes the proximate cause for the Plaintiff's alleged injuries and the Defendant's negligence is a remote cause for which he is not liable. Thus, if you find from a preponderance of the evidence in this cause that Dr. Eckman was negligent in his care and treatment of Taylor Moore on February 21, 1999, but that an independent and unforeseen act by a third person, namely the alleged failure of nursing personnel at the North Mississippi Medical Center to meet the standard of care with respect to the nursing care provided to Mr. Moore on February 21 and 22, 1999, followed Dr. Eckman's negligence, if any, and was a substantial factor in causing Mr. Moore's neurological injuries and subsequent death, then Dr. Eckman is not liable for the injuries proximately resulting from the superseding cause, and your verdict shall be for the Defendants, Dr. Eckman and Aurora Spine Centers-Mississippi, Inc.

¶12.    The main point of contention between the parties in this action appears to be a dispute of the facts in evidence and defining the moment of Taylor's injury. Dr. Eckman cites many examples that demonstrate that the cardiac arrest would not have happened but for the nurses failure to monitor Taylor every other hour from 10:00 p.m. February 21 to 6:00 a.m. February 22. Michelle argues that Dr. Eckman's negligence occurred prior to, during and after the nurses negligence because he failed to timely operate on

7

Taylor after the arrest. Michelle claims that the blood vessels in the back of Taylor's head were still open after the arrest and prompt surgery would have given Taylor "a good functional recovery."

¶13. In *M&M Pipe & Pressure Vessel Fabricators, Inc. v. Roberts*, 531 So.2d 615 (Miss. 1988), a case involving a multiple car accident resulting in a wrongful death claim, this Court addressed the issue of intervening cause and held:

> In cases involving the issue of an intervening cause, this Court has laid particular stress on the concept of "putting in motion". That is, the original actor will not be absolved of liability because of a supervening cause if his negligence put in motion the agency by or through which injuries were inflicted. *Capitol Tobacco & Specialty Co. v. Runnels*, 221 So.2d 703, 705 (Miss.1969). *See also*, e.g., *Blackmon v. Payne*, supra, 510 So.2d at 487; *Robison v. McDowell*, 247 So.2d 686, 688 (Miss.1971); *Simmons v. Amerada Hess Corp*., 619 F.2d 440, 441 (5th Cir.1980).
>
> And "if the occurrence of the intervening cause might reasonably have been anticipated, such intervening cause will not interrupt the connection between the original cause and injury." *Ross v. Louisville and Nashville RR.*, 178 Miss. 69, 84, 172 So. 752, 755 (1937). *See also*, e.g., *Touche Ross v. Commercial Union*, supra, 514 So.2d at 323; *Blackmon v. Payne*, supra, 510 So.2d at 487; *McCorkle v. United Gas Pipe Line Co.*, 253 Miss. 169, 188, 175 So.2d 480, 489 (1965). In determining whether the actor's negligence was the proximate cause of the injury, it is not necessary that the actor should have foreseen the particular injury that happened; it is enough that he could have foreseen that his conduct could cause some injury. *See*, e.g., *Nobles v. Unruh*, 198 So.2d 245, 248 (Miss.1967); *Cumberland Telephone & Telegraph Co. v. Woodham*, 99 Miss. 318, 332, 54 So. 890, 891 (1911).

Dr. Eckman cites to *Southland Management Co. v. Brown*, 730 So.2d 43, 46 (Miss. 1999), for the principle of a superseding cause. In *Southland*, this Court affirmed the Court of Appeals' ruling that an intervening cause occurred which relieved an apartment management company from liability. In this case, employees of the apartment complex deposited bathroom tiles in a wooded area near the complex. *Id*. at 44. A group of children playing in the woods began to throw the tiles at one another resulting in an eye injury to one child. *Id*. at 45. This Court affirmed the Court of Appeals' ruling that it was not foreseeable,

and thus, an intervening cause, that inert tiles would be thrown by one child and cause injury to another.

*Id*. at 48.

¶14.     In order to make this determination, the Court analyzed the facts, in part, according to the Second Restatement of Torts concerning when an intervening force can be classified as a superceding cause as follows:

> The Second Restatement of Torts has attempted to draw the dividing line by shielding a defendant from liability if the intervening force can be classed as a "superseding cause." See Restatement (Second) of Torts § 440 (1965 ). The Restatement defines a superseding cause as follows:
>
>> A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.
>> *Id*.
>
> The Restatement sets out six factors to consider in determining whether a particular intervening force can be fairly classed as a superseding cause:
>
>> (a)     the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>>
>> (b)     the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
>>
>> (c)     the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
>>
>> (d)     the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
>>
>> (e)     the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;
>>
>> (f)     the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.
>>
>> *Id*.

9

¶15. This Court finds that the acts of the nursing staff cannot be said to be an intervening and superceding cause here. While it is true that many expert witnesses testified that the nursing staff fell below the standard of care by failing to adequately monitor and perform the neurological checks on Taylor the night of February 21-22, 1999, there was also testimony that Dr. Eckman fell below the standard of care before, during and after the time period in which the nurses were to monitor Taylor. This case is distinguishable from *Southland* in that there was no break in the chain of events. In *Southland* this Court determined that the abandoned tiles were inert only to be later picked up and thrown by playing children. In essence the chain of events was broken. In *M&M*, a truck with faulty tail lights caused another driver to avoid a collision with the truck. Because the second vehicle attempted to avoid a collision with the truck, a chain of events occurred resulting in a collision involving two other vehicles. In the case sub judice, this Court finds that the nursing staff's negligence was reasonably foreseeable and does not constitute an intervening and superceding act. As such, the trial court did not abuse its discretion by denying the instruction.

## II. Whether the trial court erred in granting Michelle's motion for partial summary judgment.

¶16. In *Jenkins v. Ohio Casualty Insurance Co.*, 794 So.2d 228, 232 (Miss. 2001), this Court held that on appeal a de novo standard of review applies to a trial court ruling granting summary judgment. In *Prescott v. Leaf River Forest Products, Inc.*, 740 So.2d 301, 308-09 (Miss. 1999), this Court observed:

> On appeal this Court reviews de novo a trial court's decision to grant a motion for summary judgment, which should only be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56. A fact is material if it "tends to resolve any of the issues, properly raised by the parties." *Webb v. Jackson*, 583 So.2d 946, 949

10

(Miss.1991) (citing *Mink v. Andrew Jackson Casualty Ins. Co.*, 537 So.2d 431, 433 (Miss.1988) (quoting *Mississippi Road Supply v. Zurich-American Insurance Co.*, 501 So.2d 412, 414 (Miss.1987))). The evidence must be viewed in the light most favorable to the non-moving party. If, in this view, the moving party is entitled to a judgment as a matter of law, then summary judgment should be granted in his favor. Otherwise, the motion should be denied. *Brown v. Credit Center, Inc.*, 444 So.2d 358, 362 (Miss.1983). *Morgan v. City of Ruleville*, 627 So.2d 275, 277 (Miss.1993).

Rule 56(c) of the Mississippi Rules of Civil Procedure provides that summary judgment shall be granted by a court if "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M.R.C.P. 56(c) (emphasis added). The moving party has the burden of demonstrating that there is no genuine issue of material fact in existence, while the non-moving party should be given the benefit of every reasonable doubt. *Tucker v. Hinds County*, 558 So.2d 869, 872 (Miss. 1990).

¶17.    The complaint was filed on March 20, 2000, and an amended complaint was filed on August 24, 2000.  In their answers Dr. Eckman and Aurora pled affirmative defenses including Miss. Code Ann. § 85-5-7(7) (1999) which states: "In actions involving joint tort-feasors, the trier of fact shall determine the percentage of fault for each party alleged to be at fault."

¶18.    On September 13, 2001, Michelle filed a motion for summary judgment which was heard before the trial court on January 8, 2002.  The motion for summary judgment asserted that Dr. Eckman had the burden of proof for his affirmative defenses.  Dr. Eckman asserted in his Response to Plaintiff's Motion for Summary Judgment that § 85-5-7 operates as a matter of law and that invocation of the defense does not require expert testimony.  Prior to the hearing, Dr. Eckman provided no information indicating that there

was fault to be attributed to a third party non-defendant.[3]  After hearing arguments the trial court ruled as follows:

> With regard to the motion concerning Section 85-5-7, the motion will be denied except as to any parties not named in this lawsuit.  I think it's clear to the Court that if the defendants request an apportionment of fault instruction concerning the respective fault of the defendants, should the jury find fault with either of these defendants, they would be entitled to that.  But I don't think that I saw anything in the material submitted to me which indicates that the defendants can show that there was any fault of any third party for which the jury would be warranted in allocating or apportioning such fault to.  For that reason, the motion for summary judgment concerning Section 85-5-7 will be denied, except as to any parties not actual parties to this lawsuit, named defendants.

¶19.    Dr. Eckman argues that the trial court ruling was contrary to § 85-5-7 and case law which allows a defendant to argue liability on the part of all parties at fault whether named in the lawsuit or not.  Dr. Eckman relies in part upon *Dawson v. Townsend & Sons, Inc.*, 735 So.2d 1131 (Miss. Ct. App. 1999), and *Estate of Hunter v. General Motors Corp.*, 729 So.2d 1264 (Miss. 1999).  In *Dawson*, the Court of Appeals noted:

> Since the date of trial the supreme court has resolved this troubling question. *Estate of Hunter v. General Motors Corp.*, 729 So.2d 1264 (¶ 32) (Miss.1999). The court concluded that participants in an event who for some reason are not joined in the litigation, so-called "phantom defendants," can nonetheless have their portion of fault assigned to them. A jury may not be instructed to consider only the parties actually sued, else the defendants who are present have been unfairly denied the benefits of our system of comparative fault. *Id.* For example, a claimant could settle with one defendant in order to go after a "deep pocket" defendant. *Id*. "There is no indication that the legislature intended to reserve for plaintiffs the sole and exclusive right to make allegations of fault before a jury and to deprive defendants of the opportunity to persuade a jury that fault for a given accident lies elsewhere." *Id*. at (¶ 34). We need not further restate the analysis.

735 So.2d at 1131.

---

[3]  Answer to a first set of interrogatories and supplemental answers to plaintiff interrogatories did not indicate an expert or any testimony that attributed fault to a third party.

¶20. Michelle argues that Dr. Eckman raised the affirmative defense and, therefore, had the burden to prove any apportionment of fault. In ***Pearl Public School District v. Groner***, 784 So.2d 911, 916 (Miss. 1999), this Court stated:

> The District alleges that the amount of damages should have been apportioned among all potentially responsible parties. We agree. On the other hand, apportionment is an affirmative defense that must be pled and proven. This Court has held that "[i]t is fundamental that the burden of proof of affirmative defenses rests squarely on the shoulders of the one who expects to avoid liability by that defense." ***Marshall Durbin Cos. v. Warren***, 633 So.2d 1006, 1009 (Miss.1994).

¶21. This Court finds that the trial court did not err by granting partial summary judgment in Michelle's favor. Dr. Eckman did not provide sufficient proof that created a genuine issue of material fact. Dr. Eckman's Answer to Plaintiff's first set of Interrogatories, supplemental answers to plaintiff's interrogatories, and the deposition of Dr. Killeffer, filed as part of a supplemental exhibit, did not indicate any fault attributable to a third party. Also there were no affidavits or other information for review in the record. This issue is without merit.

### III. Whether the trial court erred by granting Michelle's motion in limine.

¶22. "A motion in limine should be granted only when '(1) the material or evidence in question will be inadmissible at a trial under the rules of evidence; and (2) the mere offer, reference, or statements made during trial concerning the material will tend to prejudice the jury.'" ***McCord v. Gulf Life Ins. Co.***, 698 So.2d 89, 91 (Miss. 1997) (quoting ***Whittley v. City of Meridian***, 530 So.2d 1341, 1344 (Miss. 1988)). *See also* ***Hageney v. Jackson Furniture of Danville, Inc.***, 746 So.2d 912, 918 (Miss. Ct. App. 1999).

¶23. Dr. Eckman next argues that the trial court erred by denying him the opportunity to cross-examine Michelle about prior inconsistent statements and allegations concerning Taylor's death. Michelle signed

13

an insurance application to collect accidental death benefits for a life insurance policy on Taylor's life.[4] The basis for Taylor's death in the application for insurance benefits was death from an accidental fall in a bathroom, whereas various pleadings and proof at trial stated that the death was caused by medical/nursing negligence. Dr. Eckman contends that he was denied an opportunity to challenge Michell's credibility and prejudiced by the trial court ruling. Michelle argues that the law is contrary to Dr. Eckman's argument and the collateral source rule prohibits this type of "impeachment" testimony exception.

¶24.    In his brief, Dr. Eckman relies upon *Martindale v. Wilbanks*, 744 So.2d 252, 254 (Miss. 1999), for his proposition that "prior inconsistent statements made in connection with insurance claims are properly admissible for impeachment matters." In *Martindale*, a mother filed suit against Wilbanks for injuries sustained by her minor child and herself in a motor vehicle accident. *Id.* at 253. This Court held that the Petition for Authority to Settle and Compromise Doubtful Claim of Minor Child was admissible evidence. *Id.* at 254. The husband, Mr. Martindale, testified that he did not file an insurance claim against his wife to collect money for his child, as guardian. *Id.* The defense then offered the settlement to impeach the husband. *Id.* This Court held that "[t]he trial judge then ruled that if Mr. Martindale had answered that he had filed a claim, the petition would not be admissible. However, Mr. Martindale had answered that he had not filed a claim. The petition was ruled correctly admissible for impeachment matters." *Id.*

¶25.    Michelle cites to *McCrary v. Caperton*, 601 So.2d 866 (Miss. 1992), and the subsequent case of *Thornton v. Sanders*, 756 So.2d 15 (Miss. Ct. App. 1999), for authority on the collateral source rule. In *McCrary* this Court held:

According to *Central Bank of Mississippi v. Butler*, 517 So.2d 507 (Miss.1987):

---

[4]  The policy terms provided payment in the event that Taylor died within one year of the accident. The payment was apparently denied because Taylor died after the one year time limit.

14

Mississippi has adopted and follows the "collateral source rule." Under this rule, a defendant tortfeasor is not entitled to have damages for which he is liable reduced by reason of the fact that the plaintiff has received compensation for his injury by and through a totally independent source, separate and apart from the defendant tortfeasor. *Id*. at 511-12 (citations omitted) (cited with approval in *Eaton v. Gilliland*, 537 So.2d 405, 408 (Miss.1989)).

Caperton contends that the evidence was not offered to the jury for the purpose of reducing the amount of the award that the jury would return, if any, but was instead offered for the express purpose of showing that McCary was engaged in a scam; that she was trying to collect for injuries she never suffered.

We have never recognized such an exception to the collateral source rule, and we refrain from doing so here. It is true that the rule as stated in Butler does not squarely fit this case. McCary did not "receive" compensation from an independent source since she never filed an insurance claim. However, *Ward v. Mitchell*, 216 Miss. 379, 62 So.2d 388 (1953), states that the collateral source rule applies not only where a claimant has already received compensation from an independent source but also where the potential for such compensation exists. We hold that the trial court committed reversible error in allowing the defendant to introduce evidence of McCary's insurance coverage or benefits of sick leave.

¶26.    Likewise, in *Thornton*, a medical malpractice case, the Mississippi Court of Appeals following the holdings of this Court, rejected an impeachment exception to the collateral source rule. *Thornton*, 756 So.2d at 18-19.

¶27.    During a hearing on the matter, the trial court heard arguments from all parties. The trial court ruled:

The Court further finds that while the Collateral Source Rule has no direct application to the application for life insurance made by Mrs. Moore, it does have some implications. The danger is there that the jury could believe that because an application for insurance was made, insurance was paid. Not that they would. The Court has no way of knowing. However, the danger is there. I think, more importantly, there is a danger that the jury could confuse what is required in making an application for insurance benefits and what constitutes proximate cause of the plaintiff's - - decedent's injuries and ultimate death for legal purposes and for the purposes of this lawsuit. Also, there is , I think, a danger that any - - and I think there is, that any probative value that might be gained from allowing the

15

defendants to attempt to impeach the plaintiff through any information on this application is outweighed by the potential for unfair prejudice that might result for the reasons I have stated. For that reason, the motion in limine will be granted also to prohibit the defendants from attempting to impeach Mrs. Moore by any alleged prior inconsistent statement which may have been made on this application for life insurance. The Court, in saying that, is not rendering an opinion that it believes that a prior inconsistent statement was made; but simply that - - well, the Court does not think that that would be proper in this case; that the danger of unfair prejudice outweighs any probative value.

¶28. In the proffer before the trial judge, Michelle never testified that she did not make a claim for accidental insurance. She, unlike the husband in *Martindale,* stated that she made an accidental insurance claim to recover those benefits. She testified that the accidental insurance form stated that the accident happened at the "Malco 10 Movie Theater. Taylor went to the men's room, slipped and fell, and hit the back of his head on the floor." Ultimately, the claim was denied because Taylor died more than one year after hitting his head. However, the trial court excluded the testimony based on the fact that the testimony would be more prejudicial than probative and not on the collateral source rule. In the analysis the trial judge determined whether the information was relevant and performed a M.R.E. 403 balancing analysis, determining that any reference to the accidental insurance death benefit claim was more prejudicial than probative. This Court finds that the trial court did not abuse its discretion by excluding the accidental death benefit information. Accordingly, this issue is without merit.

### IV. Whether the trial court erred by sustaining an objection to Dr. Eckman's testimony concerning the Moores.

¶29. Dr. Eckman next argues that the trial court erred by sustaining Michelle's objection to testimony concerning the relationship between Dr. Eckman and the Moore family. Of particular concern to Dr. Eckman was the fact that prior to being served with the complaint, he had no indication from the Moore family that they were dissatisfied or claimed negligence. Michelle argues that the testimony lacked relevance and was self-serving.

¶30.    This Court has held that the standard of review for either the admission or exclusion of evidence is abuse of discretion. *Floyd v. City of Crystal Springs*, 749 So.2d 110, 113 (Miss. 1999). "For a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Terrain Enter., Inc. v. Mockbee*, 654 So.2d 1122, 1131 (Miss. 1995).

¶31.    During Dr. Eckman's direct examination in his case-in-chief, his counsel questioned him concerning his relationship with the Moore family after Taylor suffered the arrest. The following exchanges occurred:

| | |
|---|---|
| Q. | Now, Dr. Eckman, let me ask you this. What was your - - following Taylor Moore's arrest, what was your relationship with the Moore family, with Michelle and with Mr. Bobby Moore and Minerva Moore? |
| Mr. Sessums [Counsel for Plaintiff]: | Your Honor, I object to that. That's irrelevant. |
| The Court: | What is relevance [sic], Mr. Upchurch? |
| Mr. R. Upchurch: | Your, Honor, I think it's relevant in - - in that - - in that there has been testimony that Dr. Eckman did not say things and - - did not give opinions, and he has now had conversations with them, and we think it's relevant that - - that, as to whether or not his relationship was good, adversarial in thi [sic] - - in this period of time following the arrest and - - and up until the time that - - that we're speaking of. Obviously, he's testified about what it was. If he's allowed to go to the house, there - - there's some relationship there, and we think we - - that's relevant. |
| The Court: | I'll let you proceed - - |
| Mr. R. Upchurch: | Yes, sir. |
| The Court: | - - for the time being. |
| Mr. R. Upchurch: | Yes, sir. |
| The Court: | Go ahead. |
| Mr. R. Upchurch: | Yes, sir. |

17

A.                                        Well - -

Q.                                        You - - you may answer it, Dr. Eckman.

A.                                        Okay.   I hope I don't get a little emotional on this one.  But I had a very close relationship with them. Very Close relationship with them, all of them, during this time.  I had children.  My boys were the age of their children and the age of Michelle's husband and I wanted him to improve so much.  And I felt so much for them.  That I - - I really identified with them.  And - - excuse me for doing that.  But it's  - - it's difficult to - - to see how this has changed.  When I met them in the hospital and I met them at Taylor's house, they were so happy to see me.  They gave me hugs and, you know - - -

Mr. Sessums:                     Now - - now, Your Honor, I - - I object to this, It's nothing but self - - self-serving, got nothing to do with the case.

The Court:                         I tend to agree.  Objection is going to be sustained.

Mr. R. Upchurch:               Thank you, Your Honor.

After the direct testimony was concluded, Dr. Eckman proffer his testimony concerning the relationship with the Moore family.  At the end of the proffer, Michelle's counsel stated the following:

> Mr. Sessums:   And just for the record, the objection also is relevance as well as self-serving, not just self-serving.

¶32.    Dr. Eckman argues that the trial court overruled Michelle's objection on relevancy grounds.  After some testimony, Dr. Eckman argues that Michelle then objected to his testimony as being self-serving and the trial court sustained the objection.  Because of the sustained objection, Dr. Eckman asserts that he was unable to offer more testimony concerning the Moore family and that he was irreparably prejudiced.  Further, Dr. Eckman argues that his proffered testimony was relevant to defend attacks on his credibility

18

by Michelle in her case in chief and closing arguments. He claims that he was painted as a person who did not care enough about his patients to provide adequate care.

¶33. Michelle, on the other hand, argues that Dr. Eckman's testimony was not relevant and did not address the elements of duty, breach or injury. Instead, Michelle claims that Dr. Eckman's testimony was an attempt to show that he was a good man and cared for the Moore family. In addition, Michelle argues that Dr. Eckman wanted to bolster his character, not address a credibility issue. To that extent, Michelle argues that Dr. Eckman offered nothing in the record that suggested that she attacked his character for truthfulness pursuant to M.R.E. 608(a).

¶34. Dr. Eckman claims that the trial court overruled Michelle's objection on the grounds of relevancy. This characterization of the record is somewhat overstated by Dr. Eckman. Despite Michelle's relevancy objection to the testimony concerning the relationship between Dr. Eckman and the Moore's, the trial court, as cited in the above portion of the transcript, initially allowed Dr. Eckman to "proceed" with his testimony "for the time being." However, Michelle objected again and the trial court then sustained the objection. Clearly, the trial court initially allowed some testimony from Dr. Eckman, but the trial court did not give a final ruling sustaining the objection on the relevancy and self-serving issues until the second objection by Michelle. After the proffer, counsel for Michelle attempted to make the record very clear and stated that the objection was on the grounds of relevancy and self-serving testimony. We find that the trial court did not abuse its discretion by sustaining Michelle's objections. The trial court allowed Dr. Eckman to initially testify on the issue. However, once the trial court had an opportunity to hear the actual testimony given by Dr. Eckman and Michelle objected for second time, the trial court made a proper ruling.

¶35. This Court will also address the actual proffered testimony. The proffered testimony by Dr. Eckman included his testimony that he considered his relationship with the Moores to be good, the parties bonded

19

during that time, and the Moores hugged him when he visited with the family. Dr. Eckman also stated that he was not aware of any animosity towards him until the lawsuit was filed, he was never told that he was unwelcome to visit or see Taylor, and because Taylor's case was unusual and he felt that there was a bond to the family, he wanted to see Taylor and give support to the family.

¶36. We find that Dr. Eckman was not prejudiced by the trial court's ruling excluding the testimony. The record reflects that substantially the same testimony provided during the proffer came before the jury. Prior to the objections, Dr. Eckman testified that after Taylor's release from the hospital that he visited Taylor two times at home. On the first visit Dr. Eckman saw Taylor and spoke to the family about his improvements. On the second visit, Dr. Eckman saw Taylor and spoke to the family about their concern that Taylor may be blind. Even though Dr. Eckman was no longer the treating physician, he expressed his concern that Taylor may be having mild, minor seizures and offered to assist Michelle in finding further medical treatment. After Michelle made the first objection, Dr. Eckman also testified, as cited above in the transcript excerpt, that he had a close relationship with the family, he wanted Taylor to improve, and that at the hospital and at home the family was happy to see him and hugged him. Apart from the fact that Dr. Eckman was unaware of any animosity toward him by the Moore family until the filing of the lawsuit, all of the testimony in the proffer already was before the jury. This fact standing alone is of no consequence since not all defendants in a legal action have prior knowledge nor are they entitled to prior knowledge before a lawsuit is filed against them. Nevertheless, Dr. Eckman testified that he visited with Taylor and his family on two occasions and that they were happy to see him and even hugged him. The testimony from Dr. Eckman alone indicates that the family was willing to visit with him and had no animosity toward him at that time. Thus, Dr. Eckman has made no showing of prejudice. Accordingly, this issue is without merit.

## V.    Whether the trial court erred by granting a motion to exclude expert testimony.

¶37.    As stated above the general standard of review for the admission or exclusion of evidence is abuse of discretion. *Floyd*, 749 So.2d at 113.   In *Hammond v. Grissom*, 470 So.2d 1049, 1052 (Miss. 1985), this Court stated:

> In deciding whether the trial court correctly excluded the testimony of Dr. Cockrell, the initial inquiry is whether the offered expert testimony will be of assistance to the trier of fact. *Hardy v. Brantley*, 471 So.2d 358 (Miss.1985); *Dazet v. Bass*, 254 So.2d 183 (Miss.1971). In medical malpractice cases we may say with confidence that generally expert medical testimony will be of such assistance. *Jeanes v. Milner*, 428 F.2d 598, (8th Cir.1970) (expert evidence was not required since alleged negligence was within the comprehension of a jury of laymen)....

¶38.    In *Sheffield v. Goodwin*, 740 So.2d 854, 856 (Miss. 1999), a medical malpractice case involving a dentist, this Court noted:

> Absent error so obvious that a layman could easily determine fault, expert testimony is generally required to survive summary judgment and establish the negligence of a physician. *Coleman v. Rice*, 706 So.2d 696, 698-99 (Miss.1997); *Travis,* 680 So.2d at 218; *Palmer v. Anderson Infirmary Benevolent Ass'n*, 656 So.2d 790, 795 (Miss.1995). A trial judge's determination as to whether a witness is qualified to testify as an expert is given the widest possible discretion and that decision will only be disturbed when there has been a clear abuse of discretion. *Palmer v. Biloxi Reg'l Med. Ctr., Inc.*, 564 So.2d 1346, 1357 (Miss.1990). Such discretion deserves equal respect at the summary judgment stage and the trial stage. *Id.*

¶39.    Dr. Eckman next argues that the trial court erred by excluding the expert testimony of Dr. Winfield S. Fisher, a vascular neurosurgeon.  Dr. Eckman argues that the jury was denied the opportunity to hear Dr. Fisher's testimony and weigh the credibility of his testimony against Michelle's  experts, only one of whom was a neurosurgeon who had retired.  On the eighth day of trial and during Dr. Eckman's case-in-chief, counsel for Michelle argued that Dr. Fisher's testimony was cumulative because similar testimony was provided by other experts at trial.  The trial court ruled the following:

Thank you. The Court has read and reviewed both the answers and two sets of supplemental answers by Dr. Eckman to the Plaintiff's request, or interrogatories concerning the - - Dr. Eckman's experts and has also read the deposition of Dr. Fisher. Dr. Winfield S. Fisher, whose deposition was given on November 2nd, 2001. The Court has also listened to the testimony of Dr. Killeffer and Dr. Wilberger, called by Dr. Eckman to testify concerning the standard of care applicable to Dr. Eckman and whether his actions or inactions met that standard of care. And the Court has also considered that statements of counsel, as well, as the pretrial statements and other representations by counsel that Dr. Eckman's testimony would be in the nature of expert witness testimony. Also on the standard of care and whether Dr. Eckman met that standard. The Court therefore believes that under Rule 403, that the testimony of Dr. Fisher would be cumulative, repetitive, and the Court, in its discretion under that rule, will not allow that testimony, if Dr. Eckman testifies, as the Defendant Dr. Eckman, has indicated that he will so testify. Concerning not only his experience as a treating doctor or Mr. Moore, but also concerning the standard of care and whether his actions met that standard of care. The court believes that it would be, not in the best interest of judicial efficiency to allow a parade of witnesses for either side to come forward to testify to basically the same thing. The Court and the jury will have heard enough testimony from the Plaintiff and from Dr. Eckman through his experts concerning the standard of care and whether Dr. Eckman met that standard to make its decision. Therefore your motion will be granted.

¶40.    Dr. Eckman maintains that Dr. Fisher 's specialty was neurovascular neurosurgery. Dr. Fred Killefer was a neurosurgeon who treated athletes for head and neck injuries and Dr. James Wilberger is a neurotrauma director with an interest in trauma neurosurgery. Dr. Eckman argues that Dr. Fisher's training significantly differed and his testimony would have differed from the other experts.

¶41.    In *Knotts v. Hassell*, 659 So.2d 886, 891 (Miss. 1995), this Court stated:

Miss.R.Evid. 403, nonetheless, expressly allows a trial judge to exclude evidence which he finds to be cumulative. *See also Clark v. City of Pascagoula*, 507 So.2d 70, 76 (Miss.1987) (holding that trial judge did not abuse his discretion by excluding cumulative evidence); *Christensen v. Munsen*, 123 Wash.2d 234, 867 P.2d 626, 630 (1994) (holding that trial court could limit cumulative medical evidence). The touchstone of Rule 403 is whether or not the evidence--of whatever type--is cumulative, and if evidence is in fact cumulative it is within the discretion of the court to exclude said evidence.

¶42.    Clearly, the trial court performed an extensive document review, listened to the trial testimony of defense experts, Dr. Killefer and Dr. Wilberger, read Dr. Fisher's deposition and considered statements

22

by the attorneys. Dr. Eckman asserts in his brief that Dr. Fisher's training and testimony would differ from the other two experts. Based on the thorough review of many documents, testimony and attorney statements, as well as the assertions in Dr. Eckman's brief, the trial court did not abuse its discretion by excluding the expert testimony of Dr. Fisher. Accordingly, this issue is without merit.

**VI.** **Whether the trial court erred by admitting photographs and two day in the life videos.**

¶43. "The introduction of photographs and motion pictures is a matter for the sound discretion of the trial court and that court is afforded wide latitude in exercising this discretion." *Jesco, Inc. v. Shannon*, 451 So.2d 694, 702 (Miss 1984). The admission or exclusion evidence, such as photographs, "is within the sound discretion of the trial court and that decision will be upheld unless there is an abuse of discretion." *Walker v. Graham*, 582 So.2d 431, 432 (Miss. 1991); *Trapp v. Cayson*, 471 So.2d 375, 381 (Miss. 1985). This Court in *Jesco* further held the following:

> Where the only purpose of photographs is to influence and prejudice the jury they should be excluded, but where they visualize the injury at a stage subsequent to the accident, they may not be excluded solely because they may contain emotional overtones. *Jensen v. South Adams County Water and Sanitation District*, 149 Colo. 102, 368 P.2d 209 (1962), and *Godvig v. Lopez*, 185 Ore. 301, 202 (Id. at 816).

> Caution again is stated to trial judges to preview such evidence to determine its probative value as against its prejudicial effects upon a jury.

*Id. See also Motorola Communications & Electronics, Inc. v. Wilkerson,* 555 So.2d 713, 720-22 (Miss. 1989) (a photo album containing 15 pictures of the deceased depicting his physical condition prior to death properly admitted); *Trapp*, 471 So.2d at 381 (a 120-minute day in the life video of a paraplegic performing daily tasks was admissible); *Butler v. Chrestman*, 264 So.2d 812, 816 (Miss. 1972) (color slides depicting the healing of a facial injury was properly admitted, but a five minute motion picture depicting the victim moving from bed to a wheel chair was improperly admitted where the film

periodically focused on victim grimacing, and seemingly crying from excruciating pain and suffering rather than the actual state of her injuries).

¶44.    Mississippi Rule of Evidence 401 defines relevant evidence as follows:

"Relevant Evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

¶45.    Mississippi Rule of Evidence 403 states the following:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

¶46.    Dr. Eckman contends that the trial court erred by admitting certain photographs and two "day in the life" videos of Taylor. Michelle argues that as a plaintiff she is required to assert every element of a negligence claim including injury and damage. She cites the wrongful death statute and *Gatlin v. Methodist Medical Center*, 772 So.2d 1023, 1030-31 (Miss. 2000), which includes proving "funeral and medical expenses of the decedent, the present net cash value of the life expectancy of the decedent, the loss of society and companionship of the decedent, the pain and suffering experienced by the deceased between the time of injury and the subsequent demise, and punitive damages." The photographs and videos are described as follows:

### 1.    Photographs 100046 and 100046: Instructions posted on the door of Taylor's room at rehabilitation hospital.

¶47.    These photographs, which were also contained in Video 2, showed the instructions that were posted outside Taylor's hospital room. Michelle testified to much of the information contained in these photographs.

24

## 2.	Photographs 100025, 100026, 10003, and 100036: High school photographs and senior activities sheet.

¶48.	Three photographs depicting Taylor in high school and a high school key indicating his school activities were identified by his mother, Minerva Moore (Minerva), in her testimony. Minerva testified that Taylor and Michelle met in 1994 or 1995 dated for about a year and were married. Michelle later testified that she went to the same high school as Taylor although he was three years ahead of her.

¶49.	Dr. Eckman argues that the photographs and key information were too remote in time to the lawsuit claims and lacked probative value. Dr. Eckman also claims the photographs and key engendered sympathy from the jury and their prejudicial effect outweighed the probative value. Michelle argues that the high school photographs provide part of the foundation of the proof of present net cash value of the life of Taylor.

¶50.	Taylor was a young man when he died and the high school photographs and key information provided insight into the type of person and student that Taylor was. The items provided partial foundation of Taylor's present net cash value of life, and the trial court did not err in admitting these photographs.

## 3.	Photographs 100041, 100042, 100050, 100051, 100052: Taylor and his mother at a rehabilitation hospital.

¶51.	These five photographs depict Taylor with his mother at a rehabilitation center. Three of the photos are of Taylor sitting in a chair and his mother looking at him, wiping his mouth, and holding his hand. Two of the photographs depict Taylor with what appears to be an oxygen mask on his face with his mother and son by the bedside and Taylor lying on the bed with the oxygen mask. Dr. Eckman argues that his mother, not party to the lawsuit, had the sole purpose of engendering sympathy by the jury and prejudiced Dr. Eckman. In addition, Dr. Eckman claims that the photos add nothing to the information already provided by medical records and witness testimony. Michelle argues that the photographs address Taylor's condition

and the care that he needed at the facility. This Court finds that these photographs portrayed Taylor's condition, the intense care that he needed after his arrest, and his ability or lack thereof to interact and communicate with people. The trial court did not err in admitting the photographs.

### 4. Photographs 100043, 100044, 100047, 100048, 100049: Taylor at the rehabilitation facility.

¶52. These five photographs depict Taylor undergoing apparent physical therapy, being fed by a feeding tube, being carried by staff members, having his hair washed, and lying in a bed with an oxygen mask with his wife, Michelle, and child. While Video 1 depicts many of these same scenes, they also depict Taylor's condition, the type of care required after his injuries, and the post-injury quality of interaction with his family. While there is some cumulative subject area in these photographs also contained in Video 1, the trial court did not err in admitting these photographs.

### 5. Photographs 100096, 100097, and 100098: Michelle at her baby shower.

¶53. Dr. Eckman argues that the photographs of the baby shower for Michelle and Taylor's baby are not relevant, do not show that any material fact is more or less likely to be true, are more prejudicial then probative and inflammatory because anyone knowing Taylor's condition would feel sympathy for Michelle. This Court finds that the photographs do depict a loss of companionship for Michelle; and therefore, the trial court did not err in admitting these photographs.

### 6. Photographs of Taylor and Michelle's wedding

¶54. The trial court admitted thirty-six wedding photographs depicting Taylor and Michelle's wedding. In addition, in Video 1 there was a fairly long segment that had not only still photographs, but also a portion of the live wedding ceremony. Dr. Eckman argues that 36 wedding photographs are cumulative and not probative of any issue. Dr. Eckman claims that he did not dispute that the Moores were married and the

26

photographs were not necessary to show the quality of their marriage. Rather the photographs only engendered sympathy for Michelle and prejudice against Dr. Eckman. Michelle argues that the wedding photographs address the loss of society and companionship.

¶55. In light of the portion of the actual wedding ceremony contained in Video 1, 36 additional wedding photographs are cumulative. Even without the wedding ceremony video, 36 still wedding photographs are excessive. The photographs do touch on Michelle's loss of society and companionship, however, the trial judge should not have allowed so many photographs into evidence. Given that the wedding was one event in their lives, albeit a major event, having 36 photographs of that one event and the wedding video is cumulative, but the error is harmless.

       **7.**       **Video 1 Day in the life of Taylor** (6 minutes 17 seconds); and

       **8.**       **Video 2 Day in the life of Taylor** (3 minutes 34 seconds)

¶56. Video 2 depicting Taylor with his mother, Minerva, at the rehabilitation hospital was actually shown to the jury during Minerva's testimony and prior to Video 1, which was shown during Michelle's testimony. Video 2 depicts scenes after Taylor's arrest, and Video 1 depicts scenes before and after his arrest.

¶57. Video 1 contained still photographs and motion video, including but not limited to, some of the following items: wedding photographs and a portion of the wedding ceremony video; family Christmas video; graduation ceremony and ball game of Taylor's stepson; various hospital photographs; Michelle with Taylor and their child; Taylor being washed, clothed and fed by staff; Taylor's stepson wiping Taylor's mouth; Taylor being taken for a walk and having physical therapy; Taylor with Michelle and the two children, Taylor with his stepson lying on Taylor's chest; and an ending still photograph with Taylor staring with his mouth open.

¶58. Video 2 contained still photographs and motion video including but not limited to some of the following items: Taylor in the rehabilitation hospital; Taylor being washed and his hair being washed by staff; the instructions posted on the door of Taylor's room at the rehabilitation hospital (same as those contained in photographs 100046 and 100046); Taylor's mother wiping his mouth; Taylor being pushed in a wheelchair with his child on his lap; Taylor's stepson on Taylor's chest with Taylor's mother telling Taylor that she loves him and sniffing at the time; and an ending still photograph with Taylor staring with his mouth open.

¶59. Dr. Eckman argues that the witness testimony and medical records adequately document Taylor's condition after the arrest. Further, he argues that the videos are cumulative, irrelevant, and the probative value is outweighed by the prejudicial effect. As to Video 1 in particular, Dr. Eckman argues that many photographs and scenes such as, wedding photographs and video and a party, graduation and ball game of Michelle's son by a previous marriage are not probative of the issues and the stepson is not party to the suit.

¶60. This Court finds that Mississippi case law allows videos depicting a "day in the life" videos. After reviewing Video 1 and 2 we find that the footage was relevant to proving Michelle's case. The footage showed the type of person that Taylor was prior to his injuries, the subsequent type of care that Taylor required and his inability to care for himself, and his drastically diminished capacity to interact with his wife, child and family, among other things. The trial court did not err in admitting Video 1 and 2 as described above. This issue is without merit.

## VII. Whether the trial court erred by allowing closing argument statements.

¶61. Attorneys have wide latitude in closing arguments. *Holly v. State*, 716 So.2d 979, 988 (Miss. 1998). Notwithstanding the wide latitude afforded in closing arguments "[t]he standard of review that appellate courts must apply to lawyer misconduct during opening statements or closing arguments is whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Sheppard v. State*, 777 So.2d 659, 661 (Miss. 2000). This Court has held that "any alleged improper comment must be viewed in context, taking the circumstances of the case into consideration" *Haggerty v. Foster*, 838 So.2d 948, 961 (Miss. 2003). The trial judge is in the best position to determine if an alleged objectionable remark has a prejudicial effect. *Alpha Gulf Coast, Inc. v. Jackson*, 801 So.2d 709, 727 (Miss. 2001) (citing *Roundtree v. State*, 568 So.2d 1173, 1177 (Miss. 1990)).

¶62. Dr. Eckman asserts that the trial court erred by overruling closing argument objections to statements made by counsel for Michelle. During closing arguments, counsel for Michelle stated:

> Tomorrow, Dr. Eckman will leave this courtroom or leave his house, and he'll go back to his office or to the hospital and he'll practice medicine. Michelle Moore, no matter what you do, is not going to have Jason Taylor Moore back. She will - she will have a child to raise, she will have other things to do. You may not believe it, but what you do here is important. It's important in the larger context. There is a standard of care that you heard them talking about in passing, but that standard means something. It means that physicians and hospitals are not above the law. It means that they must comply with what is reasonable under the circumstances. If they know that they are above the law, that they don't have to comply with that standard of care, they're not going to be held responsible for their actions, then the standard of care suffers. If they know that that standard of care is ample when somebody calls out and when you're asked to do something, or you know you should do something, or something that's reasonable in terms of the care of that person, then they are going to think about that. They're going to think, if I don't do this, will I be held responsible. And quite frankly I don't think they believe that a Lee county jury will hold them responsible. They think that they are above the law. If they had spent half as much time caring of [sic] Taylor Moore as they have on defending this lawsuit -

> Mr. R. Upchurch:    May it please the court? Excuse me, Counsel, that's uncalled for to argue that these defendants think they are above the law and

| | |
|---|---|
| | that - that's improper and we request that the jury be advised to disregard that. |
| The Court: | I don't believe it exceeded the bounds. It will be overruled. You may proceed. |

¶63. Dr. Eckman asserts that the comments were "outside the confines of the record" and were intended to appeal to the prejudices of the jury to return a verdict based upon sympathy, emotion, and passion rather than evidence. *See* **Boyd Constr. Co. v. Bilbro**, 210 So.2d 637, 641 (Miss. 1968); **Shell Oil Co. v. Pou**, 204 So.2d 155, 157 (Miss. 1967). He argues that there was no evidence in the record that he or Aurora considered themselves above the law, that they believed that the jury would not hold them responsible, or the time in which they prepared for the trial. Michelle argues that the comments relate to the standard of care and holds them accountable for a failure to comply with the standard. The trial court determined that the argument did not exceed the bounds of closing argument. Given that this was a case involving alleged medical negligence where the standard of care was at issue, the trial court did not abuse its discretion by allowing the comments. Dr. Eckman also argues that even though the trial court sustained his objection, Michelle made a golden rule argument by asking the jury to place itself in her shoes. The following statement were made during the closing argument:

| | |
|---|---|
| [Mr. Dallas] | It's one thing that really I - - I don't understand to some extent, is this idea of surgery. And that if we had - - if Michelle had been offered surgery, she declined it. Put yourself in Michelle's position. She's 26 years old, she's six-and-a-half months pregnant with their first child. This has just happened to you husband and he's been taken from the floor and - - |
| Mr. R. Upchurch: | May it please the Court. That argument violates the golden rule, putting yourself in the position. We - - we must object or lose that objection. |
| The Court: | It will be sustained. The way it was phrased, Mr. Dallas. |

Clearly, Dr. Eckman objected to this comment, and the trial court properly sustained the objection. Also, Dr. Eckman cites to numerous other instances of improper statements made by counsel for Michelle. A review of the record reveals that Dr. Eckman did not object to *any* of these other statements. Accordingly, these complaints are procedurally barred. Without a contemporaneous objection any alleged error is waived. *Walker v. State*, 671 So.2d 581, 597 (Miss. 1995) (citing *Foster v. State*, 639 So.2d 1263, 1270 (Miss. 1994)). The contemporaneous objection rule is in place to enable the court to correct an error with proper instructions to the jury whenever possible. *Gray v. State*, 487 So.2d 1304, 1312 (Miss. 1986) (citing *Baker v. State*, 327 So.2d 288, 292-93 (Miss. 1976)). Notwithstanding the procedural bar and without citing each of these statements, none of these statements exceeded the scope of permissible closing argument. Accordingly, this issue is without merit.

### VIII. Whether the trial court erred by refusing to grant Dr. Eckman's challenges for cause.

¶64. "Because the trial judge, due to his presence during the voir dire process, is in a better position to evaluate the prospective juror's responses, the decision of whether or not to excuse the juror is left to the trial judge's discretion." *Smith v. State*, 802 So.2d 82, 86 (Miss. 2001) (quoting *Wells v. State*, 698 So.2d 497, 501 (Miss. 1997)). In *Brown v. Blackwood*, 679 So.2d 763, 769-70 (Miss. 1997), this Court stated:

> A circuit judge has wide discretion in determining whether to excuse any prospective juror, including one challenged for cause. *Scott v. Ball*, 595 So.2d 848, 849 (Miss.1992); *Mississippi Winn-Dixie Supermarkets v. Hughes*, 247 Miss. 575, 156 So.2d 734, 738 (1963). The circuit judge has an absolute duty, however, to see that the jury selected to try any case is fair, impartial and competent. *Scott*, supra; *King v. State*, 421 So.2d 1009, 1016 (Miss.1982). "Trial judges must scrupulously guard the impartiality of the jury and take corrective measures to insure an unbiased jury." *Hudson v. Taleff*, supra; *Miss. Power Co. v. Stribling*, 191 Miss. 832, 3 So.2d 807 (1941).

"[T]he selection of jurors is "a judgment call peculiarly with the province of the circuit judge, and one we will not on appeal second guess in the absence of a record showing clear abuse of discretion."" ***Brown***, 679 So.2d at 771 (quoting ***Scott v. Ball***, 595 So.2d 848, 850 (Miss. 1992)).

¶65.     Dr. Eckman argues that the trial court erred by refusing his challenges for cause. Counsel for Dr. Eckman challenged four members of the venire for cause. The trial court granted one challenge and denied the other three challenges. In his brief, Dr. Eckman argues that Jean Middleton (Middleton) and Gina Brown (Brown) should have been struck for cause, yet they ultimately sat as jurors. Dr. Eckman appears to have made a mistake in his challenge for cause as to Brown. The record reflects that Brown was excused from the proceedings. Middleton was a plaintiff and wrongful death beneficiary in a medical negligence case and Jan Dye-Reynolds (Dye-Reynolds), not Brown, was a plaintiff in pharmaceutical litigation.

¶66.     In voir dire counsel for Dr. Eckman asked if any venire person had a bad experience with a doctor. Middleton indicated that she had a bad experience and the following exchange occurred:

Q.     Would - - was that at - - was that bad experience a personal experience?
A.     (Ms. Middleton) Yes, sir. It involved my mother.
Q.      All right. Thank you. And that - - that's my question. Let me ask you another thing, would that - - Mrs. Middleton, would that experience, that bad experience that had you [sic] with a physician with your mother, would that carry over into your judging this case? That is, would that experience be something that would - - would influence you or cause you, as you commented to be, because of that experience, just not being able to et that out of your mind and - - and being perhaps - - perhaps less favorable than you would be had you not had that experience to - - to the doctor and th hospital?
A.     (Ms. Middleton) No, sir.
Q.     Would not have any influence on you?
A.     (Ms. Middleton) No, sir.

¶67. Later, Middleton stated in voir dire that she also was a plaintiff in a wrongful death case. The case was a medical negligence suit for the death of her mother against health care providers, that being a doctor and a hospital. Dr. Eckman's counsel and Middleton had the following exchange:

Q. And would that experience cause you to identify with her [Mrs. Moore] in such a way that - - that you would be influenced if it came down to a dead even question, that - - that - - that you would be influenced toward her side [Mrs. Moore's] of the case because you've kind of been there?

A. (Ms. Middleton) No, sir. I truly do not believe that it would.

In the case of Dye-Reynolds, counsel for Dr. Eckman commented on the fact that some of the venire had indicated that they were plaintiffs in drug cases. Counsel asked the venire whether their involvement as a plaintiff in the drug suits would make them identify with Michelle. The following exchange occurred between defense counsel and Dye-Reynolds:

Q. Would the fact that you are a plaintiff, will you tend, or do you not tend to identify with her [Mrs. Moore], as - - as plaintiff in - - in - - in- - in her situation, that is trying to get - - make a recovery?

A. (Ms. Dye-Reynolds) No, sir.

Q. Okay. You can - - can you lay that aside, and - - and - - and look at Dr. Eckman's case, the hospital case with - - with - - without, dispassionately, without any identification of parties?

A. (Ms. Dye-Reynolds) Yes, sir. Her circumstances and mine are totally different.

¶68. The trial court in the case sub judice denied the challenge for cause for both Middleton and Dye-Reynolds. The denial of the challenges for cause were based upon the fact that Middleton's former wrongful death suit and Dye-Reynolds' pharmaceutical suit would not influence them in Dr. Eckman's case. The trial court did not abuse its discretion by denying the two challenges for cause. Accordingly, this issue is without merit.

## CONCLUSION

¶69. Finding no reversible error, this Court affirms the judgment of the Lee County Circuit Court.

33

¶70. **AFFIRMED.**

**PITTMAN, C.J., McRAE, P.J., WALLER AND GRAVES, JJ., CONCUR. CARLSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY SMITH, P.J., AND COBB, J. DIAZ, J., NOT PARTICIPATING.**

**CARLSON, JUSTICE, DISSENTING:**

¶71. Because the majority affirms the judgment of the Lee County Circuit Court, I must respectfully dissent. A review of the record reveals three specific instances which constitute reversible error: the failure to present Dr. Eckman's superseding cause instruction to the jury, the cumulative and prejudicial nature of the photographs and videos, and the improper statements made during closing argument. Therefore, in my opinion, the judgment of the trial court must be reversed and the case remanded for a new trial.

*Superseding Cause Instruction*

¶72. It is well-established law that a defendant is entitled to have the jury instructed on his theory of the case. *Coho Resources, Inc. v. McCarthy*, 829 So.2d 1, 23 (Miss. 2002) (citing *Higgins v. State*, 725 So. 2d 220, 223 (Miss. 1998)). However, a court may refuse a jury instruction which "incorrectly states the law, is fairly covered elsewhere in the instructions, or is without foundation in the evidence." *Id.* This Court will not reverse the verdict of the jury if that jury was fully and fairly instructed by the other instructions. *Id.*

¶73. Dr. Eckman's proposed jury instruction on superseding cause, DI-12, read as follows:

> A superseding cause is an independent and unforseen act by a third person which follows the Defendant's negligence, if any you should find, and which is the substantial factor in causing the injuries alleged by the Plaintiff. A superseding cause becomes the proximate cause for the Plaintiff's alleged injuries and the Defendant's negligence is a remote cause for which he is not liable. Thus, if you find from a preponderance of the evidence in this cause that Dr. Eckman was negligent in his care and treatment of Taylor Moore on February 21, 1999, but that an independent and unforseen act by a third person, namely the alleged failure of nursing personnel at the North Mississippi Medical

34

Center to meet the standard of care with respect to the nursing care provided to Moore on February 21 and 22, 1999, followed Dr. Eckman's negligence, if any, and was a substantial factor in causing Mr. Moore's neurological injuries and subsequent death, then Dr. Eckman is not liable for the injuries proximately resulting from the superseding cause, and your verdict shall be for the Defendants, Dr. Eckman and Aurora Spine Centers-Mississippi, Inc.

Counsel for Michelle objected to this instruction stating that superseding cause was not at issue; therefore, the trial judge refused this instruction which properly stated the law of superseding cause. However, counsel for Dr. Eckman, responding for the record, stated:

MR. D. UPCHURCH: We would urge, certainly recognize the Court's ruling on that, but for the record would state that on behalf of Dr. Eckman, we think that is an appropriate instruction and, *in particular given the testimony of Dr. Carl Hauser with regard to the alleged deviations from the standard of care from nursing personnel* on -- on the -- on February 21, 1999, and into the early morning hours of February 22nd, 1999. And given the -- the case that Dr. Hauser set out against the hospital we believe that would be a proper instruction.

(emphasis added).

¶74.    Dr. Eckman argues that the superseding cause issue revolves around the neurological checks which were to be performed by the nursing personnel at NMMC. Dr. Eckman testified that when he admitted Moore to the hospital, he ordered the nursing personnel to perform neurological checks on Moore every two hours. Michelle's expert, Carl Hauser, M.D., testified that Dr. Eckman's order was appropriate, and Michelle's neurological expert, Horace Norell, M.D., agreed with Dr. Hauser's assessment. Michelle further put on proof that the nursing personnel at NMMC failed to perform appropriately those neurological checks on Moore as ordered by Dr. Eckman.

¶75.    Although Michelle offered evidence that the nursing personnel at NMMC was negligent in their treatment of her husband, Michelle contends that Dr. Eckman was negligent before, during and after any

35

negligence by the nursing personnel. Michelle argues Dr. Eckman was negligent in failing to respond to calls made to him by the nursing personnel regarding Moore. However, Dr. Eckman testified that the last phone call he received was at 10:30 p.m. on the night of February 21, 1999, wherein the nursing personnel informed Dr. Eckman that Moore's neurological status was normal. He was not contacted again until 6:00 a.m. on February 22, 1999. During that seven and one-half hour time lapse, the nursing personnel, upon orders by Dr. Eckman, should have performed at least four other neurological checks on Moore, but, according to the testimony of Michelle's own expert witnesses, they failed to do so.

¶76. Although the superseding cause instruction was not granted by the trial judge, other jury instructions regarding nursing personnel failing to follow the proper standard of care were given. Jury Instruction No. 29, offered by the Moores, read:

> If you find from a preponderance of the evidence in this case that the nursing personnel providing medical care and treatment to Jason Taylor Moore on February 21 and 22, 1999, failed to properly monitor, assess, and take action as his medical condition required; that this failure, if any, constituted negligence, as that term is defined elsewhere in these instructions; and that *that negligence, if any, proximately cause or contributed to cause injury to and the eventual death to Jason Taylor Moore*, then you should return a verdict in favor of the Moore Family against North Mississippi Medical Center, and assess their damages.

(emphasis added). Jury Instruction No. 30, also offered by the Moores, read:

> If you find from a preponderance of the evidence in this case that the nursing personnel at North Mississippi Medical Center failed to conduct appropriate neurological checks on Jason Taylor Moore during the early morning hours on February 22, 1999, *as ordered by Dr. Eckman*; that the failure of the nurses to perform appropriate neurological checks constituted negligence as that term is defined elsewhere in these instructions; and that *this negligence, if any, proximately caused, or contributed to cause, injury or damage to Mr. Moore and his eventual death*, then you should return a verdict in favor of the Moore Family against North Mississippi Medical Center.

(emphasis added). However, these two jury instructions, along with the other instructions given to the jury, did not properly instruct the jury as to Dr. Eckman's theory of the case regarding superseding cause.

¶77. Pursuant to Jury Instruction No. 32, which was an interrogatory instruction, the jury found NMMC to be negligent in a manner which proximately caused or contributed to the injury and death of Taylor Moore and found NMMC to be forty percent (40%) at fault. Therefore, it is clear that the jury found that the nursing personnel negligently performed their duties, such as conducting proper neurological checks as ordered by Dr. Eckman, thus the superseding cause instruction was within the bounds of the evidence presented at the trial.

> [T]his Court has stated:
> > [T]hat negligence which merely furnished the condition or occasion upon which injuries are received, but does not put in motion the agency by or through which the injuries are inflicted, is not the proximate cause thereof.
>
> *Robison v. McDowell*, 247 So.2d 686, 688 (Miss. 1971). *See also*, *Hoke v. Holcombe*, 186 So.2d 474, 477 (Miss. 1966); *Mississippi City Lines, Inc. v. Bullock*, 194 Miss. 630, 640, 13 So.2d 34, 36 (1943).
>
> However, if an *antecedent negligent act puts in motion* an agency which continues in operation until an injury occurs it would appear to be more like a second proximate cause than a remote and unactionable cause.

*Blackmon v. Payne*, 510 So.2d 483, 487 (Miss. 1987) (emphasis added).

¶78. In *Mississippi City Lines v. Bullock*, 194 Miss. 630, 639, 13 So.2d 34, 36 (1943), this Court stated,

> > Although one may be negligent, yet if another, acting independently and voluntarily, puts in motion another and intervening cause which efficiently thence leads in unbroken sequence to the injury, the latter is the proximate cause and the original negligence is relegated to the position of a remote and, therefore, a non-actionable cause. Negligence which merely furnishes the condition or occasion upon which injuries are received, but does not put in motion the agency by or through which the injuries are inflicted, is not the proximate cause thereof. The question is, did the facts constitute a succession of events so linked together as to make a natural whole, or

37

was there some new and independent cause intervening between the alleged wrong and the injury?

*See also* **Touche Ross & Co. v. Commercial Union Ins. Co.**, 514 So.2d 315, 323-24 (Miss. 1987); **Saucier v. Walker**, 203 So.2d 299, 305 (Miss. 1967); **Hoke v. W.L. Holcomb & Assocs., Inc.**, 186 So.2d 474, 477 (Miss. 1966).

¶79.    Dr. Eckman and Michelle presented evidence that the negligence of the nursing personnel of NMMC contributed to the death of Taylor Moore. The jury must be instructed on all material issues presented in evidence. Therefore, the trial court erred in refusing Dr. Eckman's superseding cause instruction and, thus, denied Dr. Eckman his right to have his theory of the case properly presented to the jury.

### *Day in the Life Videos and Photographs*

¶80.    The introduction of photographs and motion pictures is a matter for the sound discretion of the trial court, and that court is afforded wide latitude in exercising this discretion. **Niles v. Sanders**, 218 So.2d 428, 432 (Miss. 1969); **Marr v. Nichols**, 208 So.2d 770, 773 (Miss. 1968). *See also* **Butler v. Chrestman**, 264 So.2d 812, 816 (Miss. 1972).

¶81.    Day-in-the-life videos are used in "personal injury and medical malpractice cases to demonstrate to the jury the daily activities of the plaintiff, specific limitations that the plaintiff encounters, or the plaintiff's physical treatment or therapy." Jane A. Kalinski, *Jurors at the Movies: Day-in-the-Life Videos as Effective Evidentiary Tool or Unfairly Prejudicial Device?*, 27 Suffolk U.L. Rev. 789, 796 (1993). "        In its purest form, a D[ay-]I[n-the-]L[ife] video will begin as the injured

party awakens and continues until he/she has gone to sleep. In actuality,

a D[ay-]I[n-the-]L[ife] video presented in court consists of approximately

38

fifteen to twenty minutes of edited tape which portrays limited segments

of daily activities."  J. Ric Gass, *Defending against Day In the Life*

*Videos*, 432 PLI/Lit 143, 148 (1992).

¶82.    In *Butler*, an 8 mm movie film which "depicted an agonizing period during (the plaintiff's) recovery"

was viewed by the jury as evidence of her pain and suffering. This Court reversed and remanded the case,

holding that:

> Where the only purpose of photographs is to influence and prejudice the jury they should be excluded, but *where they visualize the injury at a stage subsequent to the accident*, they may not be excluded solely because they may contain emotional overtones. **Jensen v. South Adams County Water and Sanitation District**, 149 Colo. 102, 368 P.2d 209 (1962), and **Godvig v. Lopez**, 185 Ore. 301, 202 P.2d 935 (1949) .
>
> Caution again is stated to trial judges to preview such evidence to determine its probative value as against its prejudicial effects upon a jury.

*Butler*, 264 So. 2d at 816 (emphasis added). In *Trapp v. Cayson*, 471 So.2d 375, 380 (Miss. 1985),

after determining the video had probative value and would be of assistance to the jury, the trial judge

allowed a one hour and twenty minute video to be viewed by the jury.

> The film depicted various activities of Cayson, such as waking up and moving from bed to wheelchair, attaching a catheter apparatus for urination, bowel evacuation procedures in the bathroom, taking a shower, dressing, eating breakfast, brushing teeth and shaving, exercising in a 'stand-up', opening mail with his teeth, moving about the house and kitchen, driving a van, emptying a legon of urine, getting undressed and going to bed. The narration of the film by Cayson consisted of explaining what he was doing in the film.

*Id.* at 381. In *Jesco, Inc. v. Shannon*, 451 So.2d 694 (Miss. 1984), the jury was allowed to watch a

film of normal burn treatment procedures which was substantially the same treatment received by Shannon.

This Court upheld the trial court's ruling finding no abuse of discretion. *Id.* at 702.

¶83.    Courts of other jurisdictions have dealt with the issue of the prejudicial nature of day-in-the-life

videos and have frequently admitted them into evidence. In *Grimes v. Employers Mutual Liability*

*Ins. Co.*, 73 F.R.D. 607 (D. Alaska 1977), Thomas I. Grimes, who was injured in an industrial accident, attempted to admit a film depicting himself performing several daily activities and conducting clinical tests. The film also contained scenes of Grimes at home with his daughter and quadriplegic brother, who were not parties to the lawsuit. Employers Mutual objected to the admissibility of the tape on several grounds including the tape was irrelevant, unduly prejudicial, and cumulative. The court held:

> *The scenes of the plaintiff with his daughter and with his quadriplegic brother serve little purpose other than to create sympathy for the plaintiff.* The prejudicial effect of these scenes outweighs the probative value of the evidence. In contrast, the other scenes of the plaintiff performing daily functions and the film of the plaintiff *performing clinical tests* have a probative value greater than any prejudice which might result. The films illustrate better than words, the impact the injury had on the plaintiff's life in terms of pain and suffering and loss of enjoyment of life.

*Id.* at 610 (emphasis added).

¶84.    In *Jones v. City of Los Angeles*, 20 Cal.App.4th 436, 442, 24 Cal. Rptr. 2d 528 (Cal. Ct. App. 1993), the trial court found that the day-in-the-life video sought to be introduced by Ms. Jones was "relevant and material to Ms. Jones's medical treatment and to an understanding of her daily life." The court of appeal affirmed the judgment of the trial court holding:

> The videotape was relevant on the issue of damages. The videotape was highly probative of the extent of Ms. Jones's injuries and graphically demonstrated her need for constant medical attention in a manner oral testimony could not convey. It also had substantial probative value on the extent of Ms. Jones's pain and suffering and was therefore helpful to the jury in calculating appropriate damages.

*Id.* at 442.

¶85.    In *Bannister v. Town of Noble, Okl.* 812 F.2d 1265 (10th Cir. 1987), Bannister, who  was rendered a paraplegic due to injuries sustained in an automobile accident, introduced a day-in-the-life video to show how he had adapted to his injury and how his paraplegia had affected his everyday life. In its

analysis concerning the admissibility of the videotape, the court outlined a number of issues a trial judge should consider prior to admitting such a film.

¶86.     The court first stated the day-in-the-life video must "fairly represent[] the facts with respect to the impact of the injuries on the plaintiff's day-to-day activities." *Id.* at 1269 (citing *Bolstridge  v. Central Maine Power Co.*, 621 F. Supp 1202, 1203 (D. Me. 1985)). A typical day-in-the-life video would not depict a victim performing improbable tasks. *Bannister*, 812 F.2d at 1269. In order for the video to have the least amount of prejudicial value, the video must portray ordinary, day-to-day situations. *Id.*

¶87.     Secondly, the court found that if "'a plaintiff is aware of being videotaped for [the purpose of litigation, it] is likely to cause self-serving behavior, consciously or otherwise.'" *Id.* (quoting *Bolstridge*, 621 F. Supp. at 1203 (citing *Haley v. Byers Transp. Co.*, 414 S.W.2d 777, 780 (Mo. 1967))). Although this is inevitable to some extent, the court cautioned against the admission of such evidence. *Bannister*, 812 F.2d at 1269.

¶88.     Next, the court determined that "a jury will better remember, and thus give greater weight to, evidence presented in a film as opposed to more conventionally elicited testimony." *Id.* The court again cautioned other courts in recognizing this legitimate concern when determining the prejudicial effect of a day-in-the-life video. *Id.*

¶89.     Finally, the court stated that effective cross-examination is lost with day-in-the-life videos. *Id.* This concern could be lessened if the victim could be cross-examined at trial regarding the film; however, the possibility that a film will be prejudicial is significantly increased when the subject of that film can not be cross-examined at trial. *Id.* at 1269-70.

¶90.    The above-cited cases where this Court and courts in other jurisdictions affirmed the admissibility of day-in-the-life videos are all similar in that they truly depicted scenes from a "day in the life" of the victim. The videos allowed the trier of fact to see how the victim's life had been changed by their injuries. However, the majority of the photographs and scenes from the videos admitted by the trial court in the case sub judice fall in the same category of those cases reversed and remanded for new trials due to their extreme prejudicial nature.

¶91.    Here, Michelle was allowed to introduce two day-in-the-life videos. The first video, which was shown during Michelle's testimony, depicts still wedding pictures and pictures of Moore's stepson, who is not a party to this lawsuit, at a graduation ceremony and a ball game. While the wedding pictures may be admissible to show Moore as he was before his injury, the proper place for these pictures is not in a "day in the life" video of Taylor Moore. These wedding pictures were also admitted in picture form. As stated in *Grimes*, the scenes of Moore's stepson, who is not a party to the lawsuit, serve no other purpose than to elicit sympathy from the jury. These scenes are also not relevant to a "day in the in the life" of Taylor Moore and should be deleted from the video. However, the video also depicts Moore engaged in physical therapy, Moore being washed, clothed and fed by staff, and Moore being visited by his wife and newborn son. These are the typical scenes which are found, and which should be found in day-in-the-life videos. If the wedding pictures and the pictures featuring Moore's stepson were deleted, this video would be admissible.

¶92.    The second video again shows Moore in the rehabilitation center. However, in this video, Moore's mother, who is also not a party to this lawsuit, is heard sobbing over her son "Momma loves you, Momma loves you." This scene is highly prejudicial. Because the second video is cumulative of the first and contains highly prejudicial scenes, it should have been excluded by the trial judge.

¶93.    It has become clear that some day-in-the-life videos are no longer being used for their proper purposes but instead, are being introduced solely for the purpose of eliciting sympathy from the jury. While I admittedly cannot begin to fully comprehend the immense pain and suffering these families have to endure, the true purpose of the day-in-the-life video is to show an actual day in the life of the victim. By introducing the videos, Michelle attempted to show such scenes but then strayed from the true purpose by incorporating additional material which is neither relevant nor probative.

¶94.    While the trial court erred by admitting the two videos, I must also address the cumulative nature of the photographs which were allowed to be admitted. In addition to the two day-in-the-life videos, the Moores were also allowed to introduce approximately seventy-five photographs. Among these photographs were photographs depicting Moore in high school and identifying his high school activities, thirty-six photographs from Taylor and Michelle's wedding, fourteen miscellaneous family pictures, two photographs of Michelle in the hospital prior to giving birth, six photographs from Michelle's baby shower, which leaves only ten photographs of Taylor in the rehabilitation center. These ten photographs were still shots from the day-in-the-life videos.

¶95.    I understand and appreciate the necessity of showing Taylor Moore as he was before his accident and the necessity in proving damages in a wrongful death suit in order for damages to be awarded. However, courts must take caution in admitting such a large number of photographs. It is certainly not hard to argue that the thirty-six pictures admitted of the Moores' wedding are cumulative. The high school photographs are too remote in time from the events giving rise to the instant case to have probative value. Although Michelle is required to prove damages, in this case loss of consortium, the photographs of Mrs. Moore at her baby shower and in the hospital prior to giving birth are more prejudicial than probative.

***Closing Arguments***

¶96.     The test in determining whether a lawyer has made an improper argument which requires reversal is "whether the natural and probable effect of the improper argument. . .create[s] an unjust prejudice against the [opposing party] result[ing] in a decision influenced by the prejudice so created." *Davis v. State*, 530 So.2d 694, 701-02 (Miss. 1988). This Court further explained in *Clemons v. State*, 320 So.2d 368 (Miss. 1975), that:

> So long as counsel in his address to the jury keeps fairly within the evidence and the issues involved, wide latitude of discussion is allowed; but, when he departs entirely from the evidence in his argument, or makes statements intended solely to excite the passions or prejudices of the jury, or makes inflammatory and damaging statements of fact not found in the evidence, the trial judge should intervene to prevent an unfair argument.

*Id.* at 371. This Court has also established that:

> While an attorney making a closing argument may not make remarks which are unfairly calculated to arouse passion or prejudice, and while we do not condone appeals to sectional prejudices of the jury, the control of such argument is left largely to the discretion of the trial judge, who is in a much better position to observe and determine what is improper.

*James W. Sessums Timber Co. v. McDaniel*, 635 So.2d 875, 882 (Miss. 1994).

¶97.     During closing argument, counsel for the Moores made the following remarks:

MR. DALLAS:     Tomorrow, Dr. Eckman will leave this courtroom or leave his house, and he'll go hack to his office or to the hospital and he'll practice medicine. Michelle Moore, no matter what you do, is not going to have Jason Taylor Moore back. She will - - she will have a child to raise, she will have other things to do. You may not believe it, but what you do here is important. It's important in the larger context. There is a standard of care that you've heard them talk about is passing, but that standard means something. IT means that physicians and hospitals are not above the law. It means that they must comply with what is reasonable under the circumstances. And if they know that they're above the law, that they don't have to comply with that standard of care, they're not going to be held responsible for their actions, then the standard of care suffers. If they know that that standard of care is ample and when somebody calls out and when you're asked to do

44

something, or something that's reasonable in terms of the care of that person, they they're going to think about that. They're going to think, if I don't do this, will I be held responsible. And quite frankly I don't think they believe that a Lee County jury will hold them responsible. They think that they're above the law. If they spent half as much time taking care of Taylor Moore as they have on defending this lawsuit - -

MR. R. UPCHURCH: May it please the Court? Excuse me, Counsel. That's uncalled for to argue that these Defendants think they are above the law and that - - that's improper and we request the jury be advised to disregard that.

THE COURT: I don't believe it exceeded the bounds. It'll be overruled. You may proceed.

¶98.    In *Shell Oil Co. v. Pou*, 204 So.2d 155 (Miss. 1967), this Court found error in the trial court's

submitting the punitive damage issue to the jury which was compounded when Pou's counsel in his closing

argument

> was permitted over objection, to state, after reading the instruction of the court authorizing the award of punitive damages, that the defendant was a corporation, had no soul, could neither go to heaven nor hell and "that the way that the law punishes a corporation for not paying their debts in a case like this, if you find that they owe actual damage, is to require them to pay a punitive damage."

*Id.* at 157. This Court, finding that the cumulative effect of the errors denied the appellants a fair trial and

required the case be reversed and remanded for a new trial, held:

> The only legitimate purpose of the [closing] argument of counsel in a jury case is to assist the jurors in evaluating the evidence and in understanding the law and in applying it to the facts. Appeals to passion or prejudice are always improper and should never be allowed.

 *Id.*

¶99.    The court of appeals in *Woods v. Burns*, 797 So.2d 331, 334 (Miss. Ct. App. 2001), applying

*Shell Oil*, determined that in order to reverse a judgment based on an improper argument claim, the court

must find first "an 'abuse, unjustified denunciation or a statement of fact not shown in the evidence.'" (citing

45

***Brush v. Laurendine***, 168 Miss. 7, 13-14, 150 So. 818, 820 (1933)), and then must find that it was "probable that this improper argument had a harmful influence on the jury." ***Id.***

¶100.   An argument made stating a party thinks he is "above the law" does not fall within the bounds of a case regarding standard of care as the Michelle argues. The purpose of this argument was not to assist the jurors in evaluating the evidence.  Instead, it was to excite their passions and prejudices and thus improperly influence the jury. The trial court erred in overruling the objection made by Dr. Eckman and finding that this improper argument did not exceed the bounds of the evidence.

¶101.   For the above-stated reasons, I must respectfully dissent. I would reverse the judgment of the Circuit Court of Lee County and remand this case for a new trial.

**SMITH, P.J., AND COBB, J., JOIN THIS OPINION.**